## IN THE UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF ILLINOIS

KEVIN GRALEWSKI,                                    )
                                                    )        Case No: 2:23-cv-02091-CRL-EIL
            Plaintiff,                              )
                                                    )
      v.                                            )        JUDGE: COLLEEN R. LAWLESS
                                                    )        MAGISTRATE: ERIC I. LONG
BOARD OF TRUSTEES OF THE                            )
UNIVERSITY OF ILLINOIS,                             )
352 Henry Administration Building,                  )
MC-350                                              )
506 S. Wright St.                                   )
Urbana, IL 61801                                    )
                                                    )
and                                                 )
                                                    )
RONY DIE, Individually, and in his                  )
capacity as Assistant Dean of Students             )
2306 Rendleman Hall                                 )
Campus Box 1058                                     )
Edwardsville, IL 62026                              )
                                                    )
and                                                 )
                                                    )
JUSTIN M. BROWN, Individually, and                  )
in his capacity as Director of the Office          )
For Student Conflict Resolution                     )
Slayter Hall Student Union, Room 409               )
200 Ridge Road,                                     )
Granville, OH 43023                                 )
                                                    )
and                                                 )
                                                    )
JANUARY BOTEN, Individually, and                    )
in her capacity as Assistant Dean of               )
Students and Investigator                           )
3816 Thornhill Circle,                              )
Champaign, Illinois 61822                           )

|                                                     |     |
|-----------------------------------------------------|-----|
|                                                     | )   |
| and                                                 | )   |
|                                                     | )   |
| DEBRA IMEL, Individually, and in her                | )   |
| capacity as Assistant Dean of Students              | )   |
| and Investigator                                    | )   |
| P.O. Box 32084                                      | )   |
| 263 Locust Street                                   | )   |
| Boone, NC 28608                                     | )   |
|                                                     | )   |
| and                                                 | )   |
|                                                     | )   |
| MARIAH YOUNG, Individually, and                     | )   |
| in her capacity as Assistant Dean of                | )   |
| Students and Investigator                           | )   |
| 300 Turner Student Services Building                | )   |
| 610 East John Street,                               | )   |
| Champaign, Illinois 61820                           | )   |
|                                                     | )   |
| and                                                 | )   |
|                                                     | )   |
| JOHN ROES 1-5, Individually, and in                 | )   |
| their official capacities                           | )   |
|                                                     | )   |
| Defendants.                                         | )   |

**PLAINTIFF'S FIRST AMENDED COMPLAINT FOR INJUNCTIVE
AND OTHER RELIEF[1]
(Jury Trial Demanded)**

NOW COMES Plaintiff, Kevin Gralewski, by and through undersigned counsel, Eric F.

Long and Tyler J. Walchanowicz, of Friedman Nemecek Long & Grant, L.L.C., and for his cause

of action against the Defendants, Board of Trustees of the University of Illinois ("the Board"),

---

[1] On June 26, 2025, this Honorable Court ordered that Plaintiff must litigate under his real name. This Amended Complaint is being filed in accordance with this Court's June 26, 2025 Order. On September 25, 2024, this Honorable Court denied, in part, and granted, in part, Defendants' Motion to Dismiss. Plaintiff has removed the dismissed Counts from this Amended Complaint. However, the filing of this Amended Complaint shall not constitute a waiver of Plaintiff's appellate rights as it relates to these rulings.

Rony Die, Justin Brown, January Boten, Debra Imel, Mariah Young, and John Roes 1-5 states the following:

## NATURE OF THE ACTION

1.      This action arises from unlawful gender discrimination, unlawful retaliation, and violations of the Title IX of the Education Amendments of 1972 ("Title IX"); Plaintiff's Due Process rights as afforded to him by the Fourteenth Amendment of the United States Constitution; and breach of contractual obligations and promises by Defendants. These violations and breaches resulted in erroneous findings of responsibility and sanctions against Plaintiff after he was falsely accused of violating University of Illinois' Sexual Misconduct Policy.

2.      After Plaintiff, a male student, was falsely accused of sexual misconduct by Jane Roe, a female student, Defendants forced Plaintiff to undergo a flawed, impartial, and bias-ridden process that unjustifiably resulted in his dismissal from the University.

3.      The process utilized by Defendants is contained within the University's Student Code, Sexual Misconduct Policy, and Student Disciplinary Procedures. Both on its face and as applied, these policies and procedures violated Plaintiff's Fourteenth Amendment Right to Due Process, his rights under Title IX, and were a material breach of the express and implied contract that existed between Plaintiff and the University of Illinois.

## JURISDICTION

4.      This Court has jurisdiction pursuant to 28 U.S.C §1331, 28 U.S.C. §1343, 42 U.S.C. §1983 and §1988, 20 U.S.C. §1681, et seq., and the Fourteenth Amendment to the Constitution of the United States of America.

## VENUE

5.     Venue is appropriate under 28 U.S.C. §1391(b).

## PARTIES

6.     Plaintiff is a natural person who resides in the State of Illinois. At all relevant times, Plaintiff was enrolled as a full-time, tuition-paying student at the University of Illinois, College of Medicine. At the time of the alleged incident, Plaintiff was on medical leave, though still fully associated with the University.

7.     Defendant Board of Trustees of University of Illinois is a body corporate and politic having power, *inter alia*, to plea and be impleaded, to make and establish by-laws, and to alter or repeal the same as they deem necessary, for the management or government, in all its various departments and relations, of the University of Illinois, for the organization and endowment. *See* 110 ILCS 305/1. The Board is sued in each and every cause of action, in any and all capacities.

8.     Defendant Rony Die was at all times relevant to this action an employee of the University of Illinois, serving as Assistant Dean of Students, as well as the advisor to the committee that found Plaintiff responsible for the alleged violations. Defendant Die is sued in his individual capacity. Defendant Die is a person under 42 U.S.C §1983 and at all times relevant to this action acted under color of state law. This Defendant's actions were final and support his designation as a final policy maker.

9.     Defendant Justin Brown was at all times relevant to this action an employee of the University of Illinois, serving as Director of the Office for Student Conflict Resolution. Defendant Brown is sued in his individual capacity. Defendant Brown is a person under 42 U.S.C §1983 and at all times relevant to this action acted under color of state law. This Defendant's actions were final and support his designation as a final policy maker.

10.     Defendant January Boten was at all times relevant to this action an employee of the University of Illinois, serving as Assistant Dean of Students, as well as an Investigator in the disciplinary matters at issue. Defendant Boten is sued in her individual capacity. Defendant Boten is a person under 42 U.S.C §1983 and at all times relevant to this action acted under color of state law. This Defendant's actions were final and support her designation as a final policy maker.

11.     Defendant Debra Imel was at all times relevant to this action an employee of the University of Illinois, serving as Assistant Dean of Students, as well as an Investigator in the disciplinary matters at issue. Defendant Imel is sued in her individual capacity. Defendant Imel is a person under 42 U.S.C §1983 and at all times relevant to this action acted under color of state law. This Defendant's actions were final and support her designation as a final policy maker.

12.     Defendant Mariah Young was at all times relevant to this action an employee of the University of Illinois, serving as Assistant Dean of Students, as well as an Investigator in the disciplinary matters at issue. Defendant Young is sued in her individual capacity. Defendant Young is a person under 42 U.S.C §1983 and at all times relevant to this action acted under color of state law. This Defendant's actions were final and support her designation as a final policy maker.

13.     Defendants Roes 1-5 were at all times relevant to this action employees of the University of Illinois and they are final policymakers. Defendant Roes 1-5 are sued in their individual capacities. Defendants Roes 1-5 are persons under 42 U.S.C §1983 and at all times relevant to this action acted under color of state law.

## FACTUAL ALLEGATIONS

***Plaintiff and Jane Roe's Relationship Through May 13, 2020.***

14.    In May of 2020, Plaintiff was a second-year medical student at University of Illinois, College of Medicine.

15.    In May of 2020, Jane Roe was a second-year medical student at the University of Illinois, College of Medicine.

16.    Plaintiff and Jane Roe were in a romantic relationship from September, 2018 through January, 2020.

17.    Plaintiff and Ms. Roe continued to communicate, spend time together, and engage in consensual sexual activity, including sexual intercourse after their formal relationship concluded. Before the alleged incident, Plaintiff and Ms. Roe had engaged in consensual sexual intercourse on or about May 3, 2020.

18.    On or about May 6, 2020, Plaintiff, as a result of a previous mental health crisis, was admitted to Pavilion Hospital, where he remained until on or around May 12, 2020.

19.    On or about May 12, 2020, Plaintiff was released from the Pavilion Hospital. Plaintiff's parents, Jane Roe and a University of Illinois staff member were present at the hospital for Plaintiff's discharge. After discharge, Plaintiff, his parents, and Ms. Roe spent the afternoon together at Westside Park.

20.    At the time, Plaintiff's residence, a single-family home, consisted, in part, of one furnished bedroom, which was also occupied by Plaintiff's parents during their visit. As such, Plaintiff asked Ms. Roe if he could sleep at Ms. Roe's apartment while his parents were in town. Ms. Roe agreed.

21.     After leaving Westside Park, Plaintiff, his parents, and Ms. Roe went to Plaintiff's home. After several minutes, Ms. Roe excused herself to return to her apartment and complete schoolwork. Plaintiff walked Ms. Roe to her car, where she initiated an intimate hug with prolonged contacted of her genital area on Plaintiff's leg.

22.     Upon returning to his home, Plaintiff took Adderall, as prescribed by his University of Illinois student health physician and began studying.

23.     Five to ten minutes later, Ms. Roe texted Plaintiff and asked him to come over to keep her company. Ms. Roe also asked Plaintiff to buy and bring her caffeine.

24.     Plaintiff left his home to buy Ms. Roe iced coffee at Dunkin Donuts.

25.     After purchasing Ms. Roe's coffee, Plaintiff arrived at Ms. Roe's apartment and was let in by Ms. Roe. Plaintiff walked inside Ms. Roe's apartment and immediately walked into the kitchen to remove the ice from the iced coffee. In doing so, he walked past Ms. Roe, who was sitting in her living room.

26.     After removing the ice, Plaintiff walked into the living room, where Ms. Roe sat at her dining/work table. Ms. Roe arose from her seat and hugged and kissed Plaintiff. Moments later, Plaintiff and Ms. Roe walked into Ms. Roe's bedroom together.

27.     In Ms. Roe's bedroom, Plaintiff suffered from an episode of psychosis as a side effect of the combination of Adderall and Lexipro. Due to the psychosis, Plaintiff's memory of the events in the bedroom are diminished.

28.     Plaintiff recalled engaging in sexual intercourse with Ms. Roe, where Ms. Roe told Plaintiff in graphic detail, that she liked the way it felt. Plaintiff did not recall any hesitation by Ms. Roe, nor did he recall Ms. Roe ever telling him no. Rather, Plaintiff reasonably interpreted the

aforementioned exclamation as words of encouragement, and consent, as Ms. Roe was a willing and active participant in the sexual intercourse.

29.    After engaging in sexual intercourse, Ms. Roe told Plaintiff that she wanted to soak in her bathtub. Plaintiff and Ms. Roe both walked into the bathroom, where Ms. Roe (a medical student) noticed that Plaintiff's pupils were abnormal, and asked Plaintiff if he had hit his head.

30.    At the direction of Ms. Roe, Plaintiff left the bathroom and laid on Ms. Roe's bed while she soaked in the tub.

31.    After getting out of the bathtub, Ms. Roe attempted to return to her schoolwork, but her internet did not work. As such, Plaintiff and Ms. Roe attempted to go to Everett Hall for internet access. However, Plaintiff and Ms. Roe were denied access, as the building was locked. When Plaintiff offered his own home and internet to Ms. Roe, she agreed, and the two went to Plaintiff's home, where Plaintiff's parents were staying. There, the two worked together on homework before returning to Ms. Roe's apartment.

32.    Back at Ms. Roe's apartment, Ms. Roe invited Plaintiff into her bed, where they talked before eventually falling asleep in Ms. Roe's bed.

33.    The next morning, Ms. Roe took an online quiz in her living room, while Plaintiff stayed in Ms. Roe's bedroom. During the quiz, Ms. Roe asked Plaintiff for help with a question on the quiz.

34.    That same morning, Plaintiff and Ms. Roe spent the morning together, and took a picture together depicting Ms. Roe hugging Plaintiff with her arms and legs wrapped around him.

35.    Around noon on May 13, 2020, Ms. Roe told Plaintiff that she wanted alone time, which was not an unusual request in Plaintiff and Ms. Roe's relationship. Plaintiff complied and left, though Ms. Roe continued to communicate with Plaintiff via text.

36.     Later that day, Ms. Roe and Plaintiff spoke on the phone. Ms. Roe informed Plaintiff for the first time that she believed Plaintiff sexually assaulted her. Plaintiff asked Ms. Roe if he could come over to discuss these allegations. Ms. Roe agreed. While there, Ms. Roe apologized to Plaintiff because "Plaintiff never gets what he wants." Shortly thereafter, while Plaintiff and Ms. Roe laid in her bed, Ms. Roe grabbed Plaintiff's hand and placed it on her breast. Plaintiff attempted to move his hand away, but Ms. Roe compelled Plaintiff to keep his hand on her breast. Ms. Roe told Plaintiff that she "wanted this," that she "needed this." Plaintiff told Ms. Roe that he did not want to engage in sexual activity with her, but Ms. Roe continued to guide his hand to other parts of her body, including her genitals. Ms. Roe then instructed Plaintiff to remove her pants and underwear and told him to perform oral sex on her. Plaintiff felt that he had no choice but to comply.

37.     After he performed oral sex on Ms. Roe, Plaintiff complained of physical symptoms, including but not limited to, dizziness and light-headedness. Ms. Roe then compelled Plaintiff to lay in her bed by taking his car key while she went outside to call her boyfriend. After a few minutes, Plaintiff found Ms. Roe outside, requested his key, and returned home.

38.     After arriving home, Plaintiff told his parents that Ms. Roe accused him of sexual assault. Due to the allegations, Plaintiff experienced another mental health crisis. Plaintiff's parents called Heather Wright, a staff member at the University, who came to Plaintiff's apartment. While there, Plaintiff told Ms. Wright that Ms. Roe accused Plaintiff of sexually assaulting her.

39.     Ms. Wright promptly reported the allegation to the University's Title IX Office.

40.     As a result of the allegations against Plaintiff, the University, through its Office for Student Conflict Resolution ("OSCR") began an investigation into the claims.

41.    Specifically, the investigation sought information into possible violations of the University's Student Code, including the University's sexual misconduct policy for allegations of sexual assault and domestic violence, as well as unauthorized entry to or use of University, public, or private premises.

42.    A formal Complaint was filed against Plaintiff in or around June, 2021.

43.    At the time the formal Complaint against Plaintiff was filed, upon information and belief, Ms. Roe did not wish to file a formal complaint or participate in the disciplinary process. Rather, Ms. Roe simply requested supportive measures and sought the University's help in ensuring that Ms. Roe did not have to see or interact with Plaintiff on campus. The University denied said request, and informed Ms. Roe that the only way it could "guarantee" that Ms. Roe did not see Plaintiff on campus was by filing a formal complaint and cooperating in the disciplinary process. By "guaranteeing" that Ms. Roe would not see Plaintiff if she filed a formal complaint and participated in the process, Defendants predetermined that Plaintiff was responsible for the allegations against him and would be removed from campus as a sanction.

44.    In October 2021, University of Illinois learned that Ms. Roe engaged in non-consensual sexual activity with Plaintiff on May 13, 2020. Defendants took no action against Ms. Roe at that time.

45.    A formal Complaint was filed against Ms. Roe in or around January, 2022.

***The University's Policies and Procedures for Claims of Sexual Misconduct***

46.    In handling complaints of sexual misconduct, The University of Illinois, and its employees, are bound to follow federal law, including but not limited to Title IX of the Education Amendments of 1972 ("Title IX"), related regulations, and judicial precedent. At the time of the alleged incident, and at the time that Ms. Wright reported the allegation, the jurisdictional scope

to Title IX allegations was not limited to on-campus conduct, meaning sexual misconduct that occurred off-campus between students triggered the Defendants obligations under Title IX.

47.     Though the alleged conduct occurred at an off-campus apartment, at the time of the alleged incident, and at the time the University learned of the report, the allegations were covered by Title IX. As such, Defendants had an obligation to promptly respond to the allegations.

48.     Defendants were also bound to follow the University's own procedures and promises, including the provisions of its 2019-2020 Student Code (attached as *Exhibit A*), which was in effect at the time the University gained knowledge of the allegation, as well its Student Disciplinary Procedures (attached as *Exhibit B*).[2]

49.     At the time of Ms. Roe's complaint against Plaintiff, the University's Policy on Sexual Misconduct (the "Policy") supplied the definition of sexual assault and domestic violence, which were applied to the charges against Plaintiff. (*See Exhibit C*).

50.     The University incorporates definitions and terms of the Policy in its Student Code (the "Code") found at studentcode.illinois.edu, contained on the University website. The Code notes that the rules apply to all undergraduate, graduate, and professional students enrolled at the University. (*See Exhibit C*).

51.     The Code includes the Defendant's basis for discipline, source, and jurisdiction. The Code details that the Defendant Board provides the authority to the Senate Committee on Student Discipline ("SCSD") to be "responsible for the administration of student discipline for acts involving violation of campus or University regulations."

---

[2] Upon information and belief, the University did not rely on the proper policies and procedures from 2019-2020. Rather, upon information and belief, the University relied on its 2020-2021 Student Code (attached as *Exhibit C*), as well as the Student Disciplinary Procedures modified and/or approved on November 30, 2020 (attached as *Exhibit D*).

52.    The Code further provides that "the basis for discipline at this campus be clearly defined."

53.    The Code establishes "Rules of Conduct" under which students are subject to discipline and includes examples of conduct that violates the University's Policy, including sexual assault.

54.    The Policy defines "sexual misconduct" to include "sexual assault." The Policy further defines, under §1-111(c)(2)(a-b), "sexual assault" as "any sexual contact that does not involve the knowing consent of each person, including any form of sexual penetration without consent; and any intentional or knowing touching or fondling by either person, directly or through clothing, of the sex organs, buttocks, or breasts of the other person for the purpose of sexual gratification or arousal of either person without consent."

55.    The Policy defines consent, in relevant part, as "informed, freely and actively given, mutually understandable words or actions that indicate a willingness to participate in mutually agreed upon sexual activity."

56.    The Policy defines "domestic violence" as a "felony or misdemeanor crimes of violence committed by: (A) a current or former spouse or intimate partner of the alleged victim; (B) a person with whom the alleged victim shares a child in common; (C) a person who is cohabitating with, or has cohabitated with, the alleged victim as a spouse or intimate partner; (D) a person similarly situated to a spouse of the alleged victim under the domestic or family violence laws of the State of Illinois; or (E) any other person against an adult or youth alleged victim who is protected from that person's acts under the domestic or family violence laws of the State of Illinois."

57.     When a student violates the community standards outlined in the Code, the Office for Student Conflict Resolution ("OSCR") has the responsibility of administering the "Student Disciplinary Procedures" as authored and authorized by the SCSD. Defendant Board provided this aforementioned authority to SCSD.

58.     The OSCR provides for "Student Disciplinary Procedures" on the website http://www.conflictresolution.illinois.edu/student_discipline/.[3]

59.     The "Student Disciplinary Procedures" is often edited and re-published. From 2019-2022, the Procedures were published on May 6, 2019; August 7, 2020; September 1, 2020; November 30, 2020; September 2, 2021; September 27, 2021; January 31, 2022; May 9, 2022.

60.     Plaintiff's alleged violation took place on or about May 12, 2020. The University learned of these allegations on or about May 14, 2020.

61.     In or around May, 2020, the University was obligated, under federal law, to promptly respond and resolve allegations of sexual misconduct. Thus, the University was required to investigate Ms. Roe's allegations against Plaintiff in May, 2020.

62.      Had the University promptly responded, as it was required to do, the May 6, 2019, Procedures would have been in effect. (*See Exhibit B*).

63.     "Appendix D" of the May 6, 2019 "Student Disciplinary Procedures" applied to any and all cases that included an accusation of sexual misconduct, including sexual assault. Appendix D defined and outlined the procedures and protocols for "Allegations of Sexual Misconduct, Including Sexual Harassment, Sexual Assault, Sexual Exploitation, Stalking, Dating Violence, and Domestic Violence."

---

[3] This represents the current version as of May 9, 2022.  A copy of the relevant portions of the Student Disciplinary Procedures in place at the time of the alleged incident and reporting thereof, is attached hereto as *Exhibits B and D*.

64.    Section 1 provided definitions for various terms within "Appendix D." For instance, Section 1(r) defined "Subcommittee on Sexual Misconduct" as, "[t]he group of faculty, staff, and students trained to adjudicate cases that include allegations of sexual misconduct, including sexual harassment, sexual assault, sexual exploitation, stalking, dating violence, and domestic violence. This group is selected by OSCR staff and approved by the SCSD." This subcommittee was not trained on impartiality, avoiding prejudgment on the facts at issue, conflicts of interest, or bias. (Section 1(r)).

65.    Section 2 provided for Complainant Rights.

66.    Among other things, Section 2 provided that:

a.    Any participating complainant is allowed to bring an advisor with them to any meeting with the investigator or any disciplinary proceeding to which they are invited, provided that this advisor is not also a witness in the investigation. This individual may communicate quietly with the complainant during such proceedings but may not speak for the complainant or otherwise directly participate (Section 2(a));

b.    All disciplinary decisions will be based on an objective evaluation of evidence. No disciplinary decisions, including credibility determinations, will be based on a person's status as a complainant, respondent, or witness or on a person's membership in a protected class as listed in the University's Nondiscrimination Policy (Section 2(f)); and

c.    Any participating complainant will have an opportunity to identify and present witnesses, to provide relevant information regarding the allegations, and to participate in an administrative hearing (if applicable). In addition, any

participating complainant may refuse to provide a requested statement or to answer a question posed to them. (Section 2(g)).

67. Section 3 provided for Respondent Rights.

68. Among other things, Section 3 provided that:

a. The respondent is allowed to bring an advisor with them to any meeting with the investigator or any disciplinary proceeding to which they are invited, provided that this advisor is not also a witness in the investigation. This individual may communicate quietly with the respondent during such proceedings but may not speak for the respondent or otherwise directly participate. (Section 3(a));

b. All disciplinary decisions will be based on an objective evaluation of evidence. No disciplinary decisions, including credibility determinations, will be based on a person's status as a complainant, respondent, or witness or on a person's membership in a protected class as listed in the University's Nondiscrimination Policy. (Section 3(f)); and

c. The respondent will have an opportunity to identify and present witnesses, to provide relevant information regarding the allegations, and to participate in an administrative hearing (if applicable). In addition, the respondent may refuse to provide a requested statement or to answer a question posed to them. (Section 3(g)).

69. Section 4 set forth the Investigation Process.

70. Among other things, Section 4 provided that:

a. The respondent and the complainant will be given the opportunity to provide supporting information and documentation and to identify witnesses. The investigator will review all submitted materials and will attempt to interview all witnesses. The investigator may also seek additional information, documentation, and witnesses from other sources. (Section 4(d));

b. The anticipated duration of an investigation is approximately 40 business days following the allegation notice… If the duration of an investigation will substantially exceed this estimate, the investigator will notify both the respondent and the complainant of the delay and the reason for the delay. (Section 4(h)); and

c. The University permits the respondent to make a formal counterclaim against a complainant. Counterclaims by the respondent may be made in good faith, but are, on occasion, also made for purposes of retaliation, and the University is committed to preventing the process described in this appendix from being abused for retaliatory purposes. After receipt of a counterclaim, the investigator will consult with the Title IX Coordinator to assess whether the allegations have been made in good faith. If the investigator and the Title IX Coordinator are unable to reach a determination based on the available information, the investigator may gather additional evidence and consult again with the Title IX Coordinator on this question. If the investigator and the Title IX Coordinator determine that the counterclaim was not made in good faith, then any investigation into the counterclaim will cease and the counterclaim itself will be evaluated as a possible violation of the University's retaliation policy. If the

investigator and the Title IX Coordinator determine that the counterclaim was made in good faith, the allegations will be resolved in accordance with the procedures described in this appendix. In some cases, the investigator may investigate the counterclaim and the original complaint together; in other cases, the investigation of the counterclaim may be delayed until after the resolution of the original complaint. How and when the counterclaim is investigated is at the sole discretion of the Executive Director. (Section 4(j)).

71.    Section 7 outlined the Formal Hearing Process.

72.    Among other things, Section 7 provided that:

    a.    Appointment of Panel. The Executive Director or their designee will appoint a Panel composed of three members of the Subcommittee on Sexual Misconduct, a pool of trained university faculty, students, and staff… Prior to serving on a Panel, all Panel members will have received appropriate annual training, developed in consultation with the university's Title IX Coordinator, on sexual harassment, sexual assault, sexual exploitation, stalking, dating violence, domestic violence, and the physiological and psychological effects of trauma. (Section 7(a)).

    b.    Hearing Rules:

        i.    Persons who have no relevant information regarding the facts of the case may not participate as witnesses. This includes character references or witnesses to irrelevant incidents. (Section 7(e)).

73.    Section 8 provided for Appeal Procedures.

74.    Among other things, Section 8 provided that:

a. Right to Appeal. Both the respondent and the complainant have the right to appeal the Panel's decision. The Dean of Students may also appeal the decision on behalf of the university. (Section 8(a)).

b. Grounds for Appeal. The appellant must base the appeal exclusively on one or more of the following grounds:

   i. The investigation and/or the hearing was not conducted fairly or in conformity with prescribed University procedures. The appellant must show that any alleged bias or deviation from the Student Disciplinary Procedures, including this appendix, is likely to have adversely affected the outcome of the original hearing.

   ii. Any sanctions imposed by the Panel were not appropriate for the violation(s) for which the student was found responsible.

   iii. New, substantive information, sufficient to alter the decision, exists and was clearly not available at the time of the original investigation and/or the hearing. (Section 8(b)).

c. Sanction Held in Abeyance Pending Appeal. The effective date of any formal or educational sanction will be held in abeyance automatically during the period in which the appeal may be filed and, once an appeal is filed, until the committee reaches a decision on the appeal; however, the Executive Director has the discretion to require that certain behavioral restrictions, such as no contact directives, remain in place pending the appeal. (Section 8(e)).

d. Appellate Review

18

i. The Chair of the SCSD or their designee will identify three SCSD members, of which one must be a faculty member and one must be a student, to consider any appeals of the Panel's decision. These individuals will constitute the Appeal Committee. Before the membership of this Appeal Committee is finalized, OSCR will provide both the respondent and the complainant with a list of all members of the SCSD. At this point, the respondent and complainant may challenge the objectivity of any person on this list. Such a challenge must be based on a conflict of interest (e.g., a prior relationship that may result in bias). The Chair of the SCSD or their designee will consider these challenges when making a final decision regarding Appeal Committee membership. Prior to serving on an Appeal Committee, all members will have received appropriate annual training, developed in consultation with the university's Title IX Coordinator, on sexual harassment, sexual assault, sexual exploitation, stalking, dating violence, domestic violence, and the physiological and psychological effects of trauma. (Section 8(f)).

75. Section 12 discussed Conflicts of Interest and Bias.

76. Among other things, Section 12 provided that:

a. Any OSCR staff member, investigator, Subcommittee on Sexual Misconduct member, or SCSD member who has a bias for or against any respondent or complainant in a specific case must recuse themselves from any role in that case. (Section 12).

19

77.    Despite this being the appropriate process to use, the University did not utilize the process described in the May 6, 2019 publication.

78.    At the time the investigation was formally launched, the latest version of the Student Disciplinary Procedures was modified and/or approved on November 30, 2020. (*See Exhibit D*).

79.    This publication contained two processes for which complaints of sexual misconduct could be investigated and adjudicated. The first process was outlined in Articles II and III. The second process was outlined in Appendix D.

80.    Articles II and III described the procedures the University used in cases involving sexual misconduct that did not fall within the jurisdictional scope of Title IX. Appendix D set forth the procedures used in cases involving sexual misconduct that did fall within the jurisdictional scope of Title IX.

81.    The defendants erroneously determined that Ms. Roe's complaint against Plaintiff was outside the jurisdictional scope of Title IX. The University improperly determined that Plaintiff's complaint against Ms. Roe was outside the jurisdictional scope of Title IX. The University of Illinois erroneously utilized Articles II and III of the November 30, 2020 version of the Student Disciplinary Procedures to guide its investigation and adjudication of both Ms. Roe's allegations against Plaintiff, as well as Plaintiff's allegations against Ms. Roe.

82.    Article II outlined the Case Coordinator and Subcommittee Hearing Procedures.

83.    Section 2.01 contained definitions to guide the procedures. Specifically, Section 2.01 defined:

        a.    Advisor. A person who provides a respondent or complainant support, guidance, or advice. Respondents and complainants may be accompanied by an

20

advisor of their choosing to any meeting with an CC or to any proceeding to which the advisee is invited. (Section 2.01(a)).

b. Case Coordinator (CC): A person responsible for investigating and/or deciding alleged violations of the Student Code… Regardless of the student respondent's college affiliation, however, cases involving allegations of sexual misconduct may only be assigned to CCs that the Director recognizes as having been trained, … on **how to conduct an investigation and hearing process that protects the safety of complainants and promotes accountability.** (Emphasis added). (Section 2.01(d)).

c. Evidence. Any information, including testimony, collected during an investigation that is relevant to the determination of whether the respondent has violated the Student Code. Neither information that solely addresses the character of any person nor information about any complainant's prior sexual conduct with anyone other than the respondent (unless such information is offered to prove that someone other than the respondent is responsible for the alleged conduct) is evidence. (Section 2.01(g)).

d. Subcommittee on Sexual Misconduct. The group of faculty, staff, and students responsible for adjudicating cases that include allegations of sexual misconduct. This group is selected through an application process overseen by OSCR and approved by the SCSD. All members are trained on the university's Sexual Misconduct Policy; the scope of the university's education program or activity; how to conduct an investigation and grievance process; how to serve impartially, including by avoiding prejudgment of the facts at issue, conflicts

21

of interest, and bias; any technology to be used at a live hearing; issues of relevance of questions and evidence, including when questions and evidence about the complainant's sexual predisposition or prior sexual behavior are not relevant; and other topics deemed appropriate by OSCR staff or required by state and federal law. (Section 2.01(r)).

84.   Section 2.02 set forth Complainant Rights.

85.   Among other things, Section 2.02 stated:

a.   The complainant may bring an advisor with them to any meeting with the CC or any disciplinary proceeding to which they are invited. This individual may communicate nondisruptively with the complainant during such proceedings but may not speak for the complainant or otherwise directly participate. (Section 2.02(a)).

b.   All disciplinary decisions will be based on an objective evaluation of evidence. No disciplinary decisions, including credibility determinations, will be based on a person's status as a complainant, respondent, or witness or on a person's membership in a protected class as listed in the university's Nondiscrimination Policy. (Section 2.02(f)).

c.   The complainant will have an opportunity to identify and present witnesses, to provide relevant information regarding the allegations, and to participate in an administrative hearing (if applicable). In addition, the complainant may refuse to provide a requested statement or to answer a question posed to them. (Section 2.02(g)).

2:23-cv-02091-CRL-EIL   # 46   Filed: 07/08/25   Page 23 of 90

     d.  Any investigation into the respondent's behavior will begin promptly and proceed in a timely manner. The complainant will receive a timely written decision following any case coordinator decision, administrative hearing, or appellate review. (Section 2.02(h)).

86.    Section 2.03 set forth Respondent Rights.

87.    Among other things, Section 2.03 stated:

     a.  The respondent may bring an advisor with them to any meeting with the CC or any disciplinary proceeding to which they are invited. This individual may communicate nondisruptively with the respondent during such proceedings but may not speak for the respondent or otherwise directly participate. (Section 2.03(a)).

     b.  All disciplinary decisions will be based on an objective evaluation of evidence. No disciplinary decisions, including credibility determinations, will be based on a person's status as a complainant, respondent, or witness or on a person's membership in a protected class as listed in the university's Nondiscrimination Policy. (Section 2.03(f)).

     c.  The respondent will have an opportunity to identify and present witnesses, to provide relevant information regarding the allegations, and to participate in an administrative hearing (if applicable). In addition, the respondent may refuse to provide a requested statement or to answer a question posed to them. (Section 2.03(g)).

     d.  Any investigation into the respondent's behavior will begin promptly and proceed in a timely manner. The respondent will receive a timely written

decision following any case coordinator decision, administrative hearing, or appellate review. (Section 2.03(h)).

88.    Section 2.04 set forth the process for the Initial Investigation.

89.    Of particular importance, section 2.04 stated:

a.    Upon receipt of a report that student may have engaged in misconduct, the Director will evaluate that report to determine whether the allegations, if substantiated, would constitute a violation of the Student Code. If not, the Director will close the case. If the report does describe a possible policy violation, the Director will assign the case to a CC, who will proceed according to subsection (b) below. If a complainant or witness provided the report directly to a CC during a scheduled appointment, the Director will typically assign the case to that CC. (Section 2.04(a)).

b.    The CC will issue a written charge notice to the respondent (to their university email address) that includes the following:

   i.    A detailed description, including the date (if known) and location (if known), of the alleged incident(s);

   ii.    The identity (if known) of any complainants involved in the incident(s);

   iii.    The section(s) of the Student Code that the respondent has been accused of violating;

   iv.    A link to these procedures or an attached copy of these procedures;

   v.    An instruction for the respondent to call within five business days to schedule a meeting with the CC (This meeting should occur within seven business days of the charge notice, unless a conflict between the CC's

24

availability and the respondent's academic schedule require the meeting to be delayed further.); and

vi. A statement that the university prohibits retaliation, knowingly making false statements to university officials, and knowingly submitting false information to university officials. (Section 2.04(b)).

1. The charge letter did not state that Respondent is presumed not responsible, as that would contradict the very purpose of these procedures, which is to protect complainants and promote accountability.

c. At the initial meeting with the respondent, the CC will summarize the allegations, explain the process, and discuss with the respondent the incident(s) under investigation, giving the respondent an opportunity to provide their perspective on the allegations. Informed by this discussion (if it occurs) and based on a reasonable evaluation of the case, the CC will determine whether the case must be decided by the CC or by the appropriate subcommittee on student conduct. The procedures for CC cases continue in §2.05. The procedures for subcommittee cases continue in §2.06. (Section 2.04(d)).

90. Section 2.05 outlined Case Coordinator Decision Procedures.

91. Section 2.05 provided that:

a. With the exception of cases in which the allegations, if true, would likely result in suspension or dismissal from the university (as determined by the Director after a reasonable application of the sanctioning guidance issued by the SCSD),

the CC has the authority to find facts and determine whether it is more likely than not that the respondent has violated the Student Code. (Section 2.05(a)).

b. If the respondent does not admit to the allegations and charges, the CC will proceed with a prompt, fair, and impartial investigation. (Section 2.05(b)).

c. The CC will attempt to interview relevant witnesses and may seek additional information, documentation, and witnesses from other sources (including any complainants). (Section 2.05(b)(ii)).

d. If the respondent fails to respond to communications from OSCR or to participate in the investigation, the CC is empowered to decide the case on the basis of the information collected. In such a situation, the CC is not required to provide the respondent with access to the investigative materials (as described in the following subsection) before deciding the case unless the respondent has requested such access in writing. (Section 2.05(b)(viii)).

e. At the conclusion of the investigation or upon admission of responsibility by the respondent, the CC will apply the preponderance of the evidence standard to find facts and to determine responsibility for any charges. If the respondent has violated the Student Code, the CC will also issue formal sanctions (other than suspension or dismissal) and educational sanctions as appropriate. (Section 2.05(c)).

92. Section 2.06 outlined the Subcommittee Decision Procedures.

93. Section 2.06 set forth that:

a. If the respondent does not admit to the allegations and charges, the CC will proceed with a prompt, fair, and impartial investigation. (Section 2.06(b)).

b.  The respondent (and any complainants) will be given the opportunity to provide supporting information and documentation and to identify witnesses. The CC will review all submitted materials and will attempt to interview all relevant witnesses. The CC may also seek additional information, documentation, and witnesses from other sources. (Section 2.06(b)(i)).

c.  The Director will appoint a Panel composed of at least one student and at least one faculty or staff member of the appropriate committee and will designate one faculty or staff member to serve as the Chair. If the respondent is a graduate student, the Panel will include a representative of the Graduate College as a non-voting member. (Section 2.06(d)).

   i.  This subsection is silent as to any requirement that the panel members must be free of bias and/or conflict of interests.

d.  Hearing rules:

   i.  Persons who have no relevant evidence regarding the facts of the case may not participate as witnesses. This includes character references or witnesses to irrelevant incidents. (Section 2.06(g)(v)).

   ii.  Any witness who is not also serving as an advisor may only participate in the hearing while providing evidence or answering questions. (Section 2.06(g)(vi)).

e.  The hearing procedures outlined in Section 2.06 made clear that victim-impact statements would not be permitted, until and unless there was a finding of responsibility. (Section 2.06(h-i)).

94.     Section 2.08 directed any member of the process to recuse themselves if they had any bias against a party, or a conflict of interest.

95.     Article III outlined the procedures for appeals.

96.     Section 3.01 provided that the appellant must base the appeal exclusively on one or more of the following grounds:

    a.  Procedural irregularity that affected the outcome of the matter.

    b.  New evidence that was not reasonably available at the time the determination regarding responsibility was made, that could affect the outcome of the matter.

    c.  The CC or Panel members had a conflict of interest or bias that affected the outcome of the matter.

    d.  Any sanctions imposed by the CC or Panel were not appropriate for the violation(s) for which the respondent was found responsible. (Section 3.01(b)).

97.     Section 3.03 provided that sanctions must be held in abeyance pending the outcome of any appeal. (Section 3.03(d)).

98.     Section 3.03 also provided the appeals committee with the ability to affirm the panel's decision, even if one of the grounds for appeals have been met, thus allowing the University to uphold its goal of "protecting complainants" even in light of demonstrably false claims or egregious procedural irregularities. (Section 3.03(g)).

99.     Appendix D of the November 30, 2020 publication provided the Student Disciplinary Procedures for Allegations of Title IX Sexual Harassment.

100.    Despite the fact that, at the time of the alleged violation, Plaintiff and Ms. Roe's alleged conduct was covered under Title IX, the University erroneously refused to apply Appendix D.

101.    Section 1 provided definitions that are applicable to the appendix.

102.    Section 1 provided additional definitions when compared to Article II, including:

    a.   Subcommittee on Sexual Misconduct. The group of faculty, staff, and students responsible for adjudicating cases that include allegations of sexual misconduct. This group is selected through an application process overseen by OSCR and approved by the SCSD. All members are trained on the university's Sexual Misconduct Policy; the scope of the university's education program or activity; how to conduct an investigation and grievance process; how to serve impartially, including by avoiding prejudgment of the facts at issue, conflicts of interest, and bias; any technology to be used at a live hearing; issues of relevance of questions and evidence, including when questions and evidence about the complainant's sexual predisposition or prior sexual behavior are not relevant; and other topics deemed appropriate by OSCR staff or required by state and federal law. (Section 1(r)).

    b.   Supportive Measures. Non-disciplinary, non-punitive individualized services offered as appropriate, as reasonably available, and without fee or charge to the complainant or respondent before or after the filing of a formal complaint. Such measures are designed to restore or preserve equal access to the university's education program or activity without unreasonably burdening the other party, including measures designed to protect the safety of all parties or the university's educational environment, or deter Title IX Sexual Harassment. Supportive measures include, but are not limited to, counseling, extensions of deadlines or other course-related adjustments, modifications or work or class

29

schedules, no contact directives, changes in work or housing locations, leaves of absence, increased security and monitoring of certain areas of the campus, and other similar measures. (Section 1(s)).

103.    Section 2 set forth Complainant Rights. These rights, for all intents and purposes, were mirrored in Article II, with the exception of providing for complainant's advisor to conduct cross-examination of the parties. (Section 2(a)).

104.    Section 3 set forth Respondent Rights. These rights, for all intents and purposes, were mirrored in Article II, with the exception of providing for respondent's advisor to conduct cross-examination of the parties. However, there were two critical additions compared to Article II. Specifically:

a.    Presumption of No Violation. The respondent is presumed not to be responsible for the alleged conduct until a final determination regarding responsibility has been made at the conclusion of this process. (Section 3(i)).

b.    Supportive Measures. The respondent has the right to request supportive measures. The Title IX Coordinator or their designee is responsible for coordinating the effective implementation of supportive measures, but the respondent may directly request that the investigator issue a no contact directive. (Section 3(j)).

105.    Section 4 discussed evidence. Here, the University made several promises regarding evidence, namely:

a.    Evidence is any information, including testimony, which is directly related to the allegations raised in the formal complaint. The investigator and the Panel have the right to reject or disregard information that is not directly related to the

allegations when compiling the Evidence Packet, creating the Investigative Report, dismissing the formal complaint, or reaching a determination regarding responsibility. (Section 4(a)).

b. The investigator and the Panel will only rely on relevant evidence when dismissing the formal complaint or reaching a determination regarding responsibility. Evidence is relevant if:

i. It has any tendency to make a fact more or less probable than it would be without the evidence; and

ii. The fact is of consequence for determining whether the formal complaint may or must be dismissed or whether the respondent is responsible for any alleged violations of the Student Code under investigation or under consideration by a Panel. (Section 4(b)).

c. During cross-examination, the Chair will only allow relevant questions, where a relevant question is one that seeks relevant evidence. (Section 4(c)).

106. Section 5 outlined the Investigation of a Formal Complaint. Among other things, Section 5 promised that:

a. Allegation Notice. As soon as is practicable after interviewing the complainant (or after unsuccessfully attempting to interview the complainant), the investigator will issue a written allegation notice (to each party's university email address, if they have one) that informs the respondent and the complainant of the following:

31

       i.   A statement that the respondent is presumed not responsible for the alleged conduct and that a determination regarding responsibility is made at the conclusion of this process. (Section 5(d)).

107.    Section 6 promised to allow the parties to review and respond to evidence.

108.    Section 7 promised that an investigation report be created which, "fairly summarizes the procedural steps taken in the investigation and the relevant evidence." Section 7 further promised that the investigator will provide a copy of the investigative report to the parties and allow the parties to respond to the report.

109.    Section 8 outlined the Formal Hearing and the hearing rules. These rules included, amongst others:

      a.   The respondent and the complainant must each have an advisor (or university-provided hearing advisor) present at the hearing in order to conduct cross-examination. If a party chooses not to attend the hearing, then their chosen advisor may attend the hearing in order to conduct cross-examination on their behalf. If a party does not bring an advisor to the hearing or if neither the party nor their chosen advisor chooses to attend the hearing, then OSCR will assign a university-provided hearing advisor to conduct cross-examination on their behalf. (Section 8(e)(4)).

      b.   Persons who have no relevant evidence to provide may not participate as witnesses. (Section 8(e)(7)).

      c.   Any witness who is not also serving as an advisor may only participate in the hearing while providing evidence or answering questions. (Section 8(e)(8)).

d.  Both parties may identify expert witnesses to provide testimony at the hearing, but to do so, the party must submit in writing to the investigator the name and contact information for the expert witness by the Investigative Report response deadline described in §7(b) above. Also, by this deadline, the expert witness must submit to the investigator a written report describing their credentials and detailing their intended testimony. This information will be provided to the other party in a timely manner, and they will have an opportunity to challenge the witness's expertise. The Chair will determine whether the expert witness will be allowed to participate based on the relevance of their testimony. (Section 8(e)(9)).

e.  Neither the complainant nor the respondent will be allowed to cross-examine, or otherwise address, each other or any witness directly. Instead, when provided for by the hearing procedures, each party's advisor of choice (or university-provided hearing advisor) will be allowed to cross-examine the investigator, the other party (or parties), and the witnesses. All questions asked during cross-examination must be relevant. (Section 8(e)(13)).

f.  Victim impact statements are prohibited unless, and until, there is a finding of responsibility. (Section 8(f-g).

110.    Section 9 provided for Appeal Procedures, which, for all intents are purposes, were the same as the Appeal Procedures outlined in Article III. Here, the University again permitted appeals to be denied, even in light of material defects in the process. Again, the University promised to hold any and all sanctions in abeyance until the appeal is concluded.

33

111.    Section 14 required any person participating in the investigation and/or adjudication of a disciplinary matter recuse themselves if they have a conflict of interest or a bias.

112.    At the time of the alleged incidents, Plaintiff and Ms. Roe's conduct was covered under Title IX. Thus, Defendants should have investigated and adjudicated the complaints using Appendix D.

113.    Defendants did not utilize Appendix D, but rather, utilized Articles II and III of the November 30, 2020 Procedures to investigate and adjudicate Jane Roe's claims against Plaintiff, and Plaintiff's claims against Jane Roe.

114.    Aside from failing to follow Articles II and III as written, Defendants applied Articles II and III differently to Plaintiff and Jane Roe. Defendants treated Jane Roe significantly more favorable than it treated Plaintiff.

115.    Defendants Debra Imel, January Boten, and Mariah Young (the "Defendant Investigators") were assigned to investigate Ms. Roe's claims against Plaintiff.

116.    Throughout the investigation, Defendant Investigators made preconceived notions as to Plaintiff's responsibility, willfully ignored relevant witnesses, and failed to probe or investigate the obvious inconsistencies or omission of relevant information by Ms. Roe. For example:

      a.  Defendant Investigators failed to explore why Ms. Roe willfully left out that she willingly spent the afternoon of the incident with Plaintiff;

      b.  Defendant Investigators failed to explore why Ms. Roe, after she engaged in consensual intercourse with Plaintiff on May 12, 2020, said that she wished it had been her boyfriend she just had sex with;

34

c.  Defendant Investigators failed to explore why, after Ms. Roe had allegedly been raped, she willingly spent the remainder of the night with Plaintiff, including going to Plaintiff's home where his parents were staying, and allowing Plaintiff to come back to her apartment;

d.  Defendant Investigators failed to explore why Ms. Roe claimed Plaintiff left her apartment in the early morning hours of May 13, 2020, yet Plaintiff provided evidence that he remained at Ms. Roe's well into the afternoon of May 13, 2020;

e.  Defendant Investigators failed to explore why, despite her claim that she was raped by Plaintiff on May 12, 2020, Ms. Roe coerced Plaintiff to engage in sexual activity with her on May 13, 2020;

f.  Defendant Investigators failed to explore why Ms. Roe willfully omitted that Plaintiff and her engaged in sexual activity on May 13, 2020; and

g.  Defendant Investigators failed to explore why, despite her claims that she was raped by Plaintiff on May 12, 2020, continued to communicate regularly with Plaintiff, including asking Plaintiff to drive her to the greater Chicago area on several occasions, and house-sit and/or watch her pet duck while she was out of town.

h.  Defendant Investigators were told that Plaintiff's parents had relevant information and decided not to interview them.

117.  Throughout the investigation, Defendant Investigators failed to treat Ms. Roe and Plaintiff equitably. Upon information and belief, Ms. Roe was promptly offered supportive measures throughout the investigation. When Plaintiff asked for supportive measures, such as

35

information of counseling services, Defendant Investigators took weeks to send him the requested information.

118.    In contrast to Defendant Investigators willfully ignoring obvious inconsistencies presented by Ms. Roe, such as her peculiar behavior after the alleged assault. Defendant Investigators badgered Plaintiff during his interview, criticized his narrative multiple times, and insinuated that his version of events was not believable.

119.    For instance, during Plaintiff's interview with Defendant Imel, Ms. Imel questioned Plaintiff various times, and even told Plaintiff that there were discrepancies in his narrative. From the report of Plaintiff's interview, it is clear that Ms. Imel doubted Plaintiff's story. Unlike the report from Plaintiff's interview, the report from Ms. Roe's interview demonstrated that Ms. Imel did not question Ms. Roe about any discrepancies or her peculiar behavior after the alleged assault, such as her stating to Plaintiff, "I wish that had been with my boyfriend," after Plaintiff and Ms. Roe had sex. The clear difference in tone establishes Defendant Imel's bias and predetermined outcome relating to each complaint.

120.    During the course of the investigation, Defendant Investigators learned that Plaintiff alleged Ms. Roe sexually assaulted Plaintiff on May 13, 2020. Defendant Investigators doubted Plaintiff and questioned why his allegation was relevant. Specifically, Ms. Imel questioned Plaintiff as to why his allegations of sexual assault by Ms. Roe were relevant. Ms. Roe was never questioned as to why her claims were against Plaintiff were relevant.

121.    On or about October 29, 2021, November 4, 2021, and November 5, 2021, a Panel of the Subcommittee on Sexual Misconduct conducted a formal hearing to address Ms. Roe's allegations against Plaintiff.

122.    Prior to the panel being chosen, Defendant Imel sent Plaintiff and Ms. Roe an email containing a list of the prospective panel members. The email instructed Plaintiff and Ms. Roe to review the list and inform the University if either party had an objection to any members. Ms. Imel stated that the "objection must be based on an identified bias (e.g., a prior relationship between you and the member) or an identified conflict of interest." The email was silent as to any other permissible objections, such as a general bias towards males or a "start by believing" attitude which hinders a person's ability to be impartial.

123.    The document attached to this email contained 36 names of prospective panel members. As such, the University tasked Plaintiff with evaluating 36 individuals and investigating whether any of the individuals were unable to serve as an impartial adjudicator in a short period of time.

124.    Under federal law, the University has an obligation to verify and evaluate whether prospective panel members are fit to serve (i.e., whether they have any bias or conflicts of interest that would hinder them from being an impartial adjudicator). Upon information and belief, the University took no steps in evaluating and verifying its prospective panel members, and instead, requested that Plaintiff and Ms. Roe fulfill the University's obligations to do so.

125.    The Panel consisted of Laurie Andrews, faculty voting member and panel chair, "Student 1", a student voting member; Kirstin Wilcox, a staff voting member; and Defendant Rony Die, advisor to the committee.

126.    At the time the University appointed Defendant Die as the advisor to the committee, the University knew that Die had a proclivity of being bias towards males, as Die had been explicitly accused of discrimination towards a male student in a previously filed lawsuit.

127.    The voting panel members had a clear bias against Plaintiff and were predisposed to believe Ms. Roe based solely on her gender, in violation of Title IX. For example:

    a.    Prior to the hearing, Student 1 stated on his social media account, "Seeing these 'I was _____' tweets hurts so much. I'm selling these stickers and donating every cent I get from them to RAINN. We see you, we hear you, we believe you." Student 1's tweet then provided a link to the stickers he sold, which contained the words "I Believe Survivors."

        i.    The very nature of Student 1's tweet suggested that he believed any person making a claim of sexual assault, without reviewing any evidence or the accused's side of the story.

    b.    Kirstin Wilcox's personal Twitter account criticized "masculinity" and "mansplaining."

128.    These biases rendered Student 1 and Kirstin Wilcox unfit to serve as members of the panel, as they were incapable of being fair and impartial.

129.    Neither Student 1 nor Kirstin Wilcox attempted to recuse themselves from the Panel, despite their clear bias and order to do so under the relevant procedures.

130.    During the hearing, the University, though the panel, treated Plaintiff and Ms. Roe inequitably, while simultaneously disregarding its own policies and procedures. For example:

    a.    The panel allowed Ms. Roe to have her a witness to serve as her advisor, allowing her to participate directly. Plaintiff was explicitly told that he could not have a witness serve as his advisor;

    b.    The panel allowed Ms. Roe to introduce multiple instances of character evidence from witnesses. Said character evidence always benefitted Ms. Roe

38

and was against Plaintiff. Upon information and belief, Plaintiff was expressly told that character witnesses were not permitted. Moreover, the University's policy states, "information that solely addresses the character of any person is not evidence.";

c.  The panel allowed multiple instances of "victim-impact" statements, despite University policies only allowing said statements in the event a respondent was found responsible;

d.  The panel questioned Plaintiff as to why it "took him so long" to participate, despite University policy being clear that any person's participation, and the extent of their participation, is completely voluntary. The panel then used Plaintiff's delayed participation against him;

e.  The panel failed to explore and/or consider any of Ms. Roe's strange behavior, the inconsistencies in her narrative, and her decisions to willfully omit relevant evidence;

f.  Student 1, who was demonstrably biased, criticized Plaintiff for mixing his medications, despite medical professionals authorizing said medication. Student 1 improperly opined that mixing medications is dangerous. Student 1 then used Plaintiff's behavior relative to the mixing of medications, which he did not agree with, against Plaintiff;

g.  The panel allowed expert testimony by Ms. Roe's advisor, who is not a medical professional. Specifically, the panel allowed Ms. Roe's advisor to opine on how trauma effects behavior, and how she "knows" Ms. Roe is being honest;

h.   The panel allowed expert testimony by Ms. Roe's counselor. Specifically, the panel allowed the counselor to discuss the effects of trauma on behavior. The counselor did not write or submit an expert report prior to the hearing, nor does Article II allow for expert witnesses;

i.   The panel allowed witnesses to discuss irrelevant information, such as Plaintiff's "prior bad acts." Such evidence was unfairly prejudicial, and was used against Plaintiff despite having no connection to the instant allegations;

j.   The panel allowed Ms. Roe's boyfriend to opine that Plaintiff was a "rapist," that Plaintiff was "clearly lying" and "clearly making statements that shows he is guilty;"

k.   The panel asked Plaintiff what Ms. Roe's motive making her allegations would be. Such a statement insinuated that false allegations are not possible and improperly shifted the burden of proof to Plaintiff.

131.   After the hearing concluded, the panel found Plaintiff responsible for violations of Section 1-302.b.1 of the Student Code – Sexual Assault.

132.   The panel concluded that, on May 12, 2020, Plaintiff engaged in non-consensual sexual intercourse with Ms. Roe.

133.   The decision letter was signed by Defendant Rony Die.

134.   To support its conclusion, the panel determined that Ms. Roe was credible, and that Plaintiff was not. Regarding Ms. Roe's credibility, the decision letter stated, "We acknowledge that during the time of this incident, the [plaintiff] had recently been hospitalized. The [plaintiff] reports that he had been diagnosed with Major Depressive Disorder with psychosis. While we received no official medical documentation corroborating this diagnosis, witnesses have

confirmed that the respondent was not well during this time. After [Ms. Roe] told [plaintiff] that he sexually assaulted her, he repeated this claim to witness [Wright]. We recognize that the [plaintiff] was not well during this conversation, and we do not believe his statements equal a confession or admission of a violation. However, we find the conversation between witness [Wright] and the [plaintiff] to corroborate further [Ms. Roe's] assertion that the [plaintiff] sexually assaulted her. The [plaintiff] reported hallucinations and delusions as the two main symptoms of psychosis in his response to the investigative report. We do not have any medical documentation to corroborate that the [plaintiff] experienced these symptoms. The information provided does not support his conversation with the complainant, and the [plaintiff's] subsequent conversation with [Wright] was a hallucination or a delusion. As a result, we found these exchanges to extend credibility significantly to [Ms. Roe's] report that the respondent sexually assaulted her on May 12, 2020."

135.    Regarding Plaintiff's credibility, the panel determined, "the [plaintiff's] statement contains a contradiction that diminished his credibility during the hearing. First, he claims to have obtained consent for an encounter he otherwise does not remember how it began. Additionally, the [plaintiff] only reports memory loss around the sexual encounter and not during other parts of May 12 and 13, 2020. Given this information, we found the [Ms. Roe's] narrative to be more credible, and it is for these reasons we found the [plaintiff] responsible for 1.302.b.1 of the student code."

136.    The decision letter was completely void as to the number of credibility issues of Ms. Roe, including, but not limited to:

a.    Roe omitting that she spent the entire afternoon with Plaintiff on May 12, 2020, which contradicted her claims that Plaintiff invited himself over to return books;

41

b. Roe omitting that she invited Plaintiff to her apartment on May 12, 2020 to keep her company and bring her caffeine, which contradicted Ms. Roe's claim that Plaintiff invited himself over to return books;

c. Roe omitting that Plaintiff spent the night in her bed on May 12, 2020, helped her with an assignment on May 13, 2020, and left in the afternoon, which contradicted Ms. Roe's claim that she kicked Plaintiff out of her apartment at 6 or 7 am on May 13, 2020;

d. Roe omitting that she sexually assaulted Plaintiff on May 13, 2020; and

e. Roe continuing to communicate and be physically present with Plaintiff on May 12, 2020 and beyond, despite her claim that she was raped.

137.    The decision letter is completely void of any rationale as to how Plaintiff's report to Wright that Ms. Roe accused him of rape corroborates that Plaintiff raped Ms. Roe. In essence, the decision letter demonstrates that the University believes an allegation alone is sufficient proof.

138.    During the investigation, Plaintiff provided pictures and text messages that corroborated his timeline of events and contradicted Ms. Roe's version of events.

139.    The decision letter was silent as to why the hearing panel ignored this evidence, which called Ms. Roe's credibility into question.

140.    The panel and Defendant Investigators started with an assumption that Ms. Roe was telling the truth; selected and interpreted evidence with the goal of supporting that assumption; disregarded other facts contradicting Ms. Roe's claims; claimed to be relying on corroborating evidence but instead based findings on speculation, personal belief and biases, and mischaracterization of evidence; shifted the burden on Plaintiff to refute Ms. Roe's claims and/or provide a motive for Ms. Roe's false allegations; denied Plaintiff the opportunity to have his case

42

heard in front of impartial decisionmakers; and found Plaintiff not-credible based on illogical inferences.

141.    As a result of the University's erroneous finding, Plaintiff was dismissed from the University.

142.    Plaintiff filed an appeal pursuant to the Policy, and his appeal was denied on January 6, 2022. His appeal decision was signed by Defendant Justin Brown.

143.    Contrary to the University's Policy, the Appeals Panel and Defendant Brown refused to acknowledge or correct the Investigator and Hearing Panel's material procedural errors and the clearly erroneous outcome, and did not address Plaintiff's specific arguments and evidence.

144.    All of the University officials involved in this matter started with a presumption that Plaintiff was responsible. This is consistent with the approach the University's proclamation on its website: which encourages creating a supportive survivor environment through STRIVE, which stands for:

      a.  Start by believing,

      b.  Talk less, listen more,

      c.  Respect survivors' decisions,

      d.  Inform survivors of resources,

      e.  Validate survivors' responses, and

      f.  Empower with empathy.  https://oiir.illinois.edu/womens-center/programs-events/survivor-strategies

145.    Defendants applied this approach only when they considered claims by Ms. Roe, a female student, against Plaintiff, a male student. When Defendants first learned of the allegation

that Ms. Roe had sexually assaulted Plaintiff, Defendants did not take immediate action, nor did they "start by believing."

146.    During the investigation of Ms. Roe's claims, Plaintiff gave the Defendant Investigators information that Ms. Roe had sexually assaulted him on May 13, 2020.

147.    Sexual assault is prohibited under University Policy.

148.    The University does not require individuals alleging violations of its Policy to make formal complaints, but rather, the University has the authority to take action and investigate claims of misconduct regardless of whether a formal complaint is filed by the victim.

149.    Under the Policy and federal law, the University and the Defendants were obligated to take Plaintiff's report as seriously as they took Ms. Roe's, to give him the support and protections they gave her, and to investigate and resolve his report just as they did hers.

150.    Defendants did not, however, promptly open an investigation of Ms. Roe's policy violations or consider them in deciding the claims against Plaintiff.

151.    Rather, Defendant Investigators responded to Plaintiff's claims against Ms. Roe by questioning him as to its relevancy and casting doubt as to his motives.

152.    It was only after Plaintiff was found responsible that Defendants began investigating Plaintiff's claims against Ms. Roe.

153.    Defendants January Boten and Mariah Young were appointed as investigators in the investigation of Ms. Roe.

154.    On or about February 1, 2022, Plaintiff met with Defendant Boten for an interview.

155.    During the interview, Plaintiff reported that on May 13, 2020, Ms. Roe forced Plaintiff to touch her body, including her breasts. Plaintiff reported that Ms. Roe insisted that Plaintiff perform oral sex on her against his will.

44

156.    Multiple times during the interview, Defendant Boten blamed Plaintiff for being the victim of sexual assault. Specifically:

    a.  Defendant Boten asked Plaintiff why he stayed in the room despite feeling uncomfortable; and

    b.  Defendant Boten asked Plaintiff what compelled him to perform oral sex on Ms. Roe, with the obvious inference being that that Ms. Boten did not believe it is possible for a woman to force a man to perform oral sex on her.

157.    Defendant Investigators never asked Ms. Roe why she did not leave the room when she claimed Plaintiff assaulted her.

158.    Defendant Investigators never asked Ms. Roe what compelled her to have sex with Plaintiff when she made her claims against him.

159.    Later in the interview, Defendant Boten asked Plaintiff why he believed Ms. Roe's conduct was a violation of University policies. Plaintiff answered that Ms. Roe coerced him to engage in sexual activity knowing that he did not consent.

160.    Ms. Boten continued to demean Plaintiff, by asking questions such as "what compelled you to do the oral sex," and "is there a reason you chose to stay in the room with her instead of leaving?"  Moreover, the University continued to probe Plaintiff as to why he believed Ms. Roe's actions were a violation of the Code.

161.    There was a stark difference in the way Plaintiff and Ms. Roe were treated as Complainants. When Ms. Roe was a Complainant, she was treated with dignity and respect. Defendant Investigators believed her report and did not blame her for what allegedly occurred. When Plaintiff was a Complainant, Investigators shifted the blame onto him, asked him why he didn't leave the room, and asked him why he chose to perform oral sex on Ms. Roe.

162.     During Ms. Roe's interview, Ms. Roe admitted to grabbing Plaintiff's hands and putting them on her body, but denied that Plaintiff did not consent. Ms. Roe further denied moving Plaintiff's hands all over her body or ordering him to take off her pants. Ms. Roe also denied ordering Plaintiff to perform oral sex on her.

163.     On June 23, 2022, Defendant Boten sent an email to Ms. Roe and Plaintiff, indicating that a decision as to the claims against Ms. Roe had been made. Ms. Boten found that Ms. Roe put Plaintiff's hands on her breasts without consent and thus found her in violation of the policy prohibiting sexual assault. Ms. Boten also found that all other sexual activity, including the oral sex, was consensual.

164.     This decision was based solely off of the interviews Ms. Boten conducted. No hearing panel was conducted for Plaintiff's claims. Defendants have provided no reasonable rationale behind its decision to refuse to hold a hearing for the claims against Ms. Roe. Instead, Defendant Brown indicated that "in [his] opinion, a reasonable application of the sanctioning guidance could not have resulted in dismissal based on the behavior investigated, so [he] determined that this would be a case coordinator decision rather than a subcommittee one."

165.     Plaintiff alleged that Jane Roe forced him to engage in sexual activity, including oral sex. There is no basis behind Defendant Brown's contention that a female forcing a male to perform oral sex on her cannot be grounds for dismissal. The only rationale for this belief is that the University treats females accused of sexual misconduct far less severely than males accused of sexual misconduct.

166.     In adjudicating Plaintiff's complaint against Ms. Roe, he was treated drastically differently than Ms. Roe was treated in the adjudication of her claims against Plaintiff, despite the claims both alleging instances of sexual assault.

46

167.    As a Complainant, Ms. Roe was given the opportunity to present her case at a live hearing, including having the opportunity to ask questions to Plaintiff and witnesses.

168.    As a Complainant, Plaintiff was not given the opportunity to present his case at a live hearing, including having the opportunity to ask questions to Ms. Roe and witnesses.

169.    There is no rationale behind this differential treatment. The only relevant difference between Plaintiff and Ms. Roe, who were both complainants and respondents, was gender.

170.    When Ms. Roe was a Complainant, she was provided the opportunity to provide a victim impact statement after Plaintiff was found responsible. The panel even asked Ms. Roe what her desired punishment and/or outcome of the matter was.

171.    When Plaintiff was a Complainant, he was not provided the opportunity to provide a victim impact statement after Ms. Roe was found responsible.

172.    There is no rationale behind this differential treatment. Plaintiff was treated differently, and discriminated against by Defendants, based solely on his gender.

173.    Despite the fact that Ms. Roe and Plaintiff were found responsible of the exact same policy violation, Defendants treated them drastically different with respect to the imposed sanction. Plaintiff was dismissed from the University as a result of his purported violation, whereas Ms. Roe was placed on University probation and ordered to write a research paper, while continuing as a student in the University's medical school.

***University of Illinois' Culture of Male Discrimination***

174.    This unlawful, differential, and discriminatory treatment was all based on a deeply rooted atmosphere and culture at the University of Illinois in discriminating against male students in the student disciplinary process.

47

175.    In part, through the Women's Resource Center ("WRC") on the University's campus, as well as the Office of Inclusion & Intercultural Relations ("OIIR"), Defendants have created a culture around campus wherein women are always to be believed and that women are victims and that males who are accused of misconduct are predators who must be removed from the University.

176.    Both OIIR and WRC speak on behalf of the University as a whole and reflect the University's position and voice relative to the issues set forth herein.

177.    OIIR's webpage contains a "Commitment to Survivors." On this webpage, it reads, "you are not alone. We believe you. The University of Illinois believes that all students have the right to live free of violence. The OIIR cultural and resource centers are committed to providing support to all students, including survivors of stalking, sexual exploitation, sexual harassment, domestic violence, dating violence, and sexual violence, and take seriously our role in creating a campus community without abuse. You are not alone." The webpage then includes a list of the "support services" the University offers "survivors." The only support service listed is the WRC. There is no Men's Resource Center at the University, nor is there any support service dedicated to male students. The message is clear: women will be believed and offered support. Men will have to go out of their way to receive equal accommodations and treatment. http://oiir.illinois.edu/news-statements/commitment-survivors.

178.    The welcome page of WRC states, "Since its founding in 2009, the Women's Resources Center has been committed to supporting women students, while catalyzing the development of their personal and professional selves," and "The mission of the Women's Resources Center is to improve the campus climate for women students." https://oiir.illinois.edu/womens-center.

179.    While the home page claims that the WRC offers advocacy for students of all genders, there is nothing on the home page or WRC's accompanying page and social media posts that would make a male student feel welcome. The statement that WRC offers advocacy for all genders is nothing more than an empty gesture.

180.    The home page features multiple pictures, all of women, including one photo of a female holding a sign that says, "Walking at night should be our right! Stop violence against women." There are no men featured on the home page. https://oiir.illinois.edu/womens-center.

181.    In fact, many of the subpages of WRC's website contain photos, the overwhelming majority of them containing only women.

182.    The featured staff profiles only highlight women. https://oiir.illinois.edu/womens-center/about-wrc/people.

183.    The contact page contains contact information of staff. All persons listed are female. https://oiir.illinois.edu/womens-center/about-wrc/contact-us.

184.    WRC's "Mission" page contains a picture of a sign that reads, "Walking at night should be our right! Stop violence against women." The mission page also contains language stating that WRC's mission is to "Provide advocacy and support for survivors of sexual misconduct, and their support person(s)." Each and every goal of the WRC is geared towards women. https://oiir.illinois.edu/womens-center/about-wrc/our-story.

185.    WRC's "Advocacy and support services page" contains pictures of three women holding domestic violence awareness boards. There are no pictures of men holding domestic violence boards. https://oiir.illinois.edu/support-services.

186.    WRC's "resources for family, friends, and supportive partners" page gives tips for individuals who know someone claiming to be a victim of misconduct. Here, the page orders persons to:

    a.   Believe: Believe the person's experience without question. Do not blame them. Whatever the circumstances, they were not looking for or asking to be assaulted. It is very common for the survivor to blame themselves, but the blame rests squarely and only with the person who chose to harm them. There is no way of knowing what would have happened if the survivor had acted differently.

    b.   Respect: Respect the person's fear. Abusive partners or assaulters commonly threaten to harm a survivor if they do not comply. Often, survivors feared that they would not survive an assault, unless they did exactly what the other person was asking/demanding of them. This fear does not go away when the abusing partner/assaulter does. This fear is real. Help the survivor process their fear by exploring resources, offering to accompany them to meetings, and finding other ways to increase their safety. Above all, any steps taken to increase a survivor's safety should be done with that survivor's consent, regardless of how good one's intentions may be. Part of reasserting that a survivor has power means respecting their choices to use/not use help that is offered and allowing them to pursue options according to their own timeline.

    c.   Accept: There may be strong feelings. A survivor has the right to any emotion: to be numb, sad, angry, in denial, terrified, depressed, agitated, withdrawn, etc. Being supportive is an attitude of acceptance of all feelings, an atmosphere of

warmth and safety. Tolerate their needs; be there for them. Be patient when their needs change.

d.  Listen: Let them know you want to listen. Try to understand what they are going through. They did the very best they knew how in a threatening situation. They survived. Give them credit. Remind them that surviving is/was the more important thing they could do. Listening looks like:

   i.  Letting them talk; do not interrupt.

   ii.  When you ask them what they need from you, hear and support them. Even if it's not what you think you would do in this situation.

   iii.  You may feel nervous about stalls and silences. It's okay to be quiet.

   iv.  Try repeating back the things they've said as a way to continue the talking.

   v.  Reassure them that they are not to blame. Blaming questions such as, "Why didn't you scream?" is not helpful. Instead, you might say, "It's difficult to scream when you are frightened."

e.  Take It Seriously: Pay attention. This will help validate the seriousness of the survivor's feelings and their need to work them through. Stalking, and sexual and relationship abuse can lead to serious trauma, and it takes a lot of courage for a survivor to trust another person with their story of what has happened. It may be months or longer before a survivor feels like their healing journey has progressed. Healing takes time and looks different for everyone.

f.  Be Survivor Centered: Do not pressure them into making decisions or doing things they are not ready to do. Help them explore all the options. Offer to research and follow through if they agree. Remember that it is essential to

respect privacy and confidentiality. Let them decide who knows about what happened, and do not share their story with anyone else unless it is with their permission.

g. Care About Their Wellbeing: In order to care about your friend, family member or loved one, you may need to cope with some difficult emotions of your own. If you are experiencing rage, blame or changes in how you feel about your friend/relative/partner, you can be most helpful to them by finding ways of coping with your own emotions. Stalking, sexual and relationship abuse is not provoked nor desired by the victim. In fact, it is motivated by the perpetrator's need for power and control. Advocacy programs in your area have staff/volunteers that can help people sort through their feelings and emotions. https://oiir.illinois.edu/womens-center/advocacy-support-services/resources-family-friends

187.    The aforementioned tips are centered around the belief that everyone should believe an accuser, no matter what.

188.    This belief is relayed on WRC's "Survivor strategies" page, which urges individuals to "start by believing" and "validate survivors' responses." https://oiir.illinois.edu/womens-center/programs-events/survivor-strategies.

189.    WRC's "sexual assault awareness month" webpage features a picture of a group of women holding bags that read, "you are enough." There are no male students featured on this page. https://oiir.illinois.edu/womens-center/wrc-events/SAAM.

190.    WRC hosted "the clothesline" project, which "began when a small core of women found a way to take the staggering, mind-numbing statistics on violence against women and turn

them into a striking and memorable teaching tool that honors survivors and victims and raises consciousness." This webpage highlights the meaning of the various colors of clothing. Specifically, it states:

    a.   white represents women who died because of violence;

    b.   yellow or beige represents battered or assaulted women;

    c.   red, pink, and orange are for survivors or rape and sexual assault;

    d.   blue and green t-shirts represent survivors of incent and sexual abuse;

    e.   purple or lavender represents women attacked because of their sexual orientation;

    f.   black is for women attacked for political reasons.

191.    The clothesline project is overwhelmingly targeted towards women, not men.

192.    WRC hosted and advertised a number of peer-facilitated workshops. These workshops included First Year Campus Acquaintance Rape Education (FYCARE); ICARE; I Heart Healthy Relationships; and Guard. A primary goal of these workshops centered around supporting survivors, which according to WRC begins by believing the accuser. These workshops aimed to train all involved that any woman who alleges that she is a victim, is in fact a victim. The workshops aimed to train all involved that anyone accused of sexual misconduct is guilty. https://oiir.illinois.edu/womens-center/sexual-violence-prevention.

193.    One program hosted by WRC is First Year Campus Acquaintance Rape Education (FYCARE). WRC's FYCARE webpage describes the program as "an interactive discussion on campus sexual assault." https://oiir.illinois.edu/womens-center/our-programs/fycare. The page continues to state that "Nationwide, 1 in 5 women will experience a sexual assault during her

undergraduate years.[4] Males can be sexually assaulted, too, though at a much reduce estimate than women. The perpetrators of these assaults are most often acquaintances—friends, classmates, or dating partners—of the victim. Despite this, many discussions of sexual violence focus on the ways individuals should protect themselves from strangers. FYCARE, on the other hand, focuses on the ways that all students can be involved bystanders who can look out for the safety of one another." While the webpage acknowledges that males can be sexually assaulted too, the webpage makes sure to point out that it is far less often, strengthening the culture on campus that men sexually assault women and that women should be believed at all costs.

194.    FYCARE is mandatory for all incoming first-year and transfer students. Here, students learn that the way to support survivors is to "start by believing." Students also learn that women are always honest about allegations of sexual misconduct and that while men can be assaulted, it is rare and should be taken less seriously than when a woman claims she was sexually assaulted.

195.    All student disciplinary panels contain at least one student voting member. These student voting panel members have all been mandated to attend the FYCARE program upon their arrival on campus, where they learn that they should "start by believing."

---

[4] The "one in five" "statistic," regularly cited by government officials and many others as the basis for government policy decisions, disciplinary processes, training materials, and advocacy efforts, has been thoroughly discredited. E.g.     https://www.washingtonpost.com/news/fact-checker/wp/2014/05/01/one-in-five-women-in-college-sexually-assaulted-the-source-of-this-statistic/;     https://www.washingtonexaminer.com/no-1-in-5-women-have-not-been-raped-on-college-campuses http://www.slate.com/articles/double_x/doublex/2015/09/aau_campus_sexual_assault_survey_why_such_surveys_don_t_paint_an_accurate.html.  The Bureau of Justice Statistics' National Crime Victimization Survey reports a much lower rate of sexual assault: 6.1 per 1000 female students from 1995 to 2013, with the rate trending downwards. https://www.bjs.gov/content/pub/pdf/rsavcaf9513.pdf. Similarly, advocates for reported victims often suggest false accusations of sexual assault are rare. These claims, too, have been disputed, have been undermined by some high-profile cases, and do not appear to take into account the wide spectrum of situations in which complaints can be made. But regardless of the accuracy of these claims, the decision in any particular case should be based on the facts of that case, objectively and fairly assessed. One sexual assault is too many; one false accusation is too many.

196.    The FYCARE webpage includes one photo, in which only women are present. https://oiir.illinois.edu/womens-center/our-programs/fycare.

197.    At all relevant times, the University's sexual misconduct prevention and training program for all students also included "Men & Masculinities" programming that examined masculinity in connection with sexual assaults and involved discussions around "ending violence against women and femmes, . . . intersectional feminisms, [and] consent." It conducted no similar programming examining femininity in connection with sexual assaults or about ending violence against men.

198.    WRC's "Resources" page states, "The WRC has many resources available to students, staff, and faculty, like our Advocacy and Support Services for survivors of sexual misconduct." However, the only photo featured on the page is of three women. There is nothing on the page to invite or indicate that males are welcome to utilize these resources. https://oiir.illinois.edu/womens-center/resources.

199.    The WRC has a library on-site. The contents of the library include "materials of interest to students related to women, gender expression, issues that affect women, literature by and about women, films and music and other publications. Additionally, we have pamphlets and brochures especially relevant to supporting individuals who have experienced trauma or are trying to get assistance to recover from issues such as addiction, eating disorders, or discrimination." https://oiir.illinois.edu/womens-center/resources/library

200.    WRC has several social media pages, including Facebook and Twitter. WRC utilizes these pages to post updates and advertise for events. Similar to WRC's webpage, WRC's social media posts are geared towards women, suggest that women are the only gender that can be survivors, and promote the idea that all persons should believe accusations made by women.

2:23-cv-02091-CRL-EIL    # 46    Filed: 07/08/25    Page 56 of 90

201.    On April 25, 2022, WRC posted a flyer on its Facebook page announcing that it was seeking applicants for an open Director position. In the flyer, it states, "WRC improves the campus climate for women and develops and implements programs that address women's issues and gender-related concerns." The contents of the Facebook post stated that the WRC is looking for "a dynamic, passionate, survivor-centered leader." The University doubles down on its core principals of "start by believing" and "all accusers are truthful."

202.    On October 15, 2021, WRC, through its Facebook page, advertised for a program titled, "Toxic Masculinity? Machismo in the Latinx Community." Toxic Masculinity traditionally refers to negative traits and characteristics of males.

203.    On April 1, 2021, WRC advertised, via its Facebook page, its list of events in honor of Sexual Assault Awareness Month. Many of these events were anti-male, pro-female, including one titled, "Not Your Average Locker Room Talk." Locker room talk is a negative term used to describe the way males typically talk about women and sex.

204.    On January 15, 2021, WRC announced, via its Facebook page, that it had been awarded a $300,000 grant from the Department of Justice. WRC vowed to use this money to "provide fund for a number of new initiatives on the issue of stalking, and strengthening existing collaborative efforts to support survivors of sexual misconduct." WRC believes that all female accusers are survivors, and all allegations of sexual misconduct made by females are truthful.

205.    On October 14, 2020, WRC, through its Facebook page highlighted the four confidential advisors on its staff. All four advisors are women. Upon information and belief, WRC did not have, and does not have any male advisors.

206.    On August 28, 2020, WRC advertised, through its Facebook page, a program it hosted titled, "The Pandemic No One is Talking About: Violence Against and Expected Silence from Black Women."

207.    On April 29, 2020, WRC, through its Facebook page, posted a picture of a female wearing jeans. The words on the picture read, "She was wearing tight jeans." Underneath are the words, "There is no excuse and never an invitation to rape." WRC does not have any similar posts involving male students.

208.    On April 26, 2020, WRC, through its Facebook page, highlighted a song by "Fletcher" titled, "I Believe You." The song's lyrics convey a message that all women are honest about allegations of sexual misconduct and that the appropriate reaction is to "start by believing." The song contains pro-female and anti-male undertones, yet WRC promoted this song despite their claim that the WRC is an inclusive place for all genders.

209.    On April 12, 2020, WRC, through its Facebook page, promoted a song by "Rihanna," titled, "Man Down." By WRC's own admission, the song is about a woman who shoots and kills the man who assaulted her.

210.    On April 3, 2020, WRC, through its Facebook page, promoted a coloring book titled, "We Believe You." The book promotes one of the core values of WRC: all women who accuse men of sexual misconduct are survivors and that all women should be believed.

211.    On February 24, 2020, WRC, through its Facebook page, promoted a quote from Raliance, an anti-sexual violence organization. The quote read, in relevant part, "Too many survivors still do not come forward for fear that they won't be believed or supported. This is particularly true for girls and women of color."

212.    On October 7, 2020, WRC, through its Twitter page, promoted a quote from Kamala Harris during the Vice President Presidential Debate. During the debate, Mike Pence attempted to interrupt Kamala Harris, who responded by stating, "I'm speaking. I'm speaking." Along with the promotion of this quote, WRC stated, "Your voices matter!" The voices WRC is referring to is the voices of women.

213.    On October 3, 2020, WRC's Twitter page "liked" a tweet from Reaching Across Classes, which stated that WRC is a great resource for women on campus. There was no mention that WRC was a resource for men.

214.    On February 26, 2019, WRC's Twitter page "liked" a tweet from "BlackWomensBlueprint," which read, "Sexual violence is a public health issue. #BWTRC #BelieveBlackWomen."

215.    WRC's webpage, as well as its social media accounts are riddled with other posts and language that convey anti-male, pro-female undertones, and that promote the notion that women are always truthful regarding sexual misconduct claims, that they should be believed at all costs, and that male students cannot be victims of sexual misconduct by women, and are instead, only perpetrators.

216.    Despite one single sentence on a webpage stating that male students are welcome to seek support at WRC, WRC's very title, remaining words and actions establish otherwise. In reading WRC's webpage and social media accounts, no reasonable male student would believe that WRC is a welcoming place for males.

217.    Defendants as a whole has adopted the beliefs set forth by WRC.

218.    These discriminatory beliefs led Defendants to:

    a.   Ignore Ms. Roe's credibility issues, including her willful omissions of relevant information, her strange behavior after the alleged assault, and her documented inaccuracies;

    b.   Ignore Plaintiff's documented evidence proving that Ms. Roe was intentionally omitting information, inaccurate about her timeline, and attempting to manipulate the narrative;

    c.   Blame Plaintiff for any mental health crisis he experienced that day;

    d.   Engaged in several material procedural irregularities, all of which benefitted Ms. Roe;

    e.   Take Plaintiff's claim of sexual misconduct against Ms. Roe far less seriously than Ms. Roe's claims against Plaintiff;

    f.   Treat Ms. Roe and Plaintiff drastically different from one another as both Complainants and Respondents; and

    g.   Erroneously conclude that Plaintiff was responsible for sexual assault.

## <u>COUNT I</u>

**Discrimination in Violation of Title IX of the Education Amendments of 1972**
**(Against the Board of Trustees)**

219.    Plaintiff repeats and realleges each and every allegation set forth above as if fully rewritten herein.

220.    Defendant's disciplinary proceedings against Plaintiff, as detailed above, violated Title IX of the Education Amendments of 1972 and/or subsequent regulations.

221.    Defendant discriminated against Plaintiff and deprived him of the benefits of its education program through its discriminatory, gender-based implementation of its disciplinary process, by refusing to treat Plaintiff in a manner consistent with which they treated Ms. Roe as a

Respondent, by expelling him as a result of that process, by issuing significantly greater sanctions than against Ms. Roe, despite being found responsible for the same policy violation, and by initially refusing to investigate his reports of misconduct by Ms. Roe.

222.    Defendant's disciplinary proceedings against Ms. Roe, as detailed above, violated Title IX.

223.    Defendant discriminated against Plaintiff and deprived him of the benefits of its education program through its discriminatory, gender-based implementation of its disciplinary process, by taking his claims of misconduct against Ms. Roe less seriously than it took Ms. Roe's claims against Plaintiff, by refusing to treat Plaintiff in a manner consistent with which they treated Ms. Roe as a Complainant, and by issuing significantly less severe sanctions against Ms. Roe, despite being found responsible for the same policy violation with which it used to dismiss Plaintiff.

## A. Starting in 2011, the federal government pressured educational institutions to provide more protection to students alleging sexual assault, focusing on protection of women.

224.    In the years leading up to the incident in question, colleges in the United States, including University of Illinois, have been subjected to pressure from the federal government, the public, and members of college communities to take campus sexual misconduct more seriously, provide more protection to purported victims, and crack down on purported offenders.

225.    On April 4, 2011, the OCR issued a "significant guidance document" commonly referred to as the 2011 "Dear Colleague Letter." Letter from Russlynn Ali, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ., Office for Civil Rights (Apr. 4, 2011) at n.1, available at http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf (hereinafter "2011 Dear Colleague Letter").

226.    Although the letter marked a substantial change in OCR's position on how schools should handle disciplinary proceedings under Title IX, OCR did not conduct the public notice and comment process required for proposed regulations. See Administrative Procedure Act, 5 U.S.C. § 553.

227.    The press release announcing the letter stated that it was "the first specifically advising schools, colleges and universities that their responsibilities under Title IX include protecting students from sexual violence," and that it included "new steps to help our nation's schools, universities and colleges end the cycle of sexual violence on campus." The press release made clear the focus was on protecting women: it stated that despite past progress "the threat of violence and abuse continues for a new generation of women"; it lauded the "unprecedented coordination and cooperation across the federal government to combat violence against women"; it stated that one in five women "will be a victim of sexual assault during college"; and it highlighted "the Administration's commitment to raising awareness and promoting policies to prevent sexual violence against women of all ages." *Vice President Biden Announces New Administration Effort to Help Nation's Schools Address Sexual Violence (Apr. 4, 2011),* https://www.ed.gov/news/press-releases/vice-president-biden-announces-new-administrationeffort-help-nations-schools-ad.[5]

228.    The 2011 Dear Colleague Letter itself explicitly focused on protection of women, repeating the claim that "about 1 in 5 women are victims of completed or attempted sexual assault while in college" and stating that "the majority of campus sexual assaults occur when women are incapacitated, primarily by alcohol." *2011 Dear Colleague Letter* at 2 & n.3.

---

[5] *Supra* note 2.

229.     The 2011 Dear Colleague Letter reaffirmed in principle that both accusers and accused have the right to have a prompt and equitable resolution, including the right to an adequate, reliable, and impartial investigation; similar and timely access to any information that will be used at the hearing; and adequately trained factfinders and decision makers. *Id.* at 9-11.

230.     The letter also, however, contained other provisions which expanded the nature and scope of schools' responsibility to address sexual misconduct, essentially compelling them to choose between fundamental fairness for students and continued federal funding. These provisions are not required by Title IX and are not consistent with legal precedent.

231.     Among other things, the 2011 Dear Colleague Letter directed schools to ensure "steps taken to accord due process rights to the alleged perpetrator do not restrict or unnecessarily delay the Title IX protections for the complainant" (*id.* at 12); directed schools to take interim steps to protect complainants and "minimize the burden on the complainant" (*id.* at 15-16); "strongly discourage[d]" schools from allowing cross-examination of parties (*id.* at 12); and urged schools to focus on victim advocacy (*id.* at 19 n.46).

232.     The 2011 Dear Colleague Letter also stated that schools "must use a preponderance of the evidence standard (i.e., it is more likely than not that sexual harassment or violence occurred)," and must not use the "clear and convincing standard (i.e., it is highly probable or reasonably certain that the sexual harassment or violence occurred)." *Id.*

233.     Given the fact that campus disciplinary proceedings lack key procedural protections provided in court litigation (including discovery, the right to active representation by counsel, rules of evidence, and independent judges and juries to make decisions), the existence of other governmental and public pressure discussed in more detail below, and the severe and

lasting consequences of a finding of responsibility for sexual misconduct, the preponderance standard does not adequately protect accused students' rights.

234.    Even though the 2011 Dear Colleague Letter purports to be a "guidance" document and did not go through rulemaking procedures, OCR framed many of its directives, including the directive to use the preponderance of the evidence standard, as mandatory.

235.    Moreover, the 2011 Dear Colleague Letter contained an explicit threat to colleges and universities: "When a recipient does not come into compliance voluntarily, OCR may initiate proceedings to withdraw Federal funding by the Department or refer the case to the U.S. Department of Justice for litigation."  Id. at 16.

236.    The overriding purpose of the 2011 Dear Colleague Letter was "to make it easier for victims of sexual assault to make and prove their claims and for the schools to adopt punitive measures in response," and OCR "demand[ed] that universities do so or face a loss of federal funding." *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 572 (D. Mass. 2016). As the *Brandeis* court observed, while "[t]he goal of reducing sexual assault, and providing appropriate discipline for offenders, is certainly laudable," the effect of the letter was "the elimination of basic procedural protections—and the substantially increased risk that innocent students will be punished." *Id.*

237.    The 2011 Dear Colleague Letter has been described as the "first warning shot" that OCR intended to punish any school that failed to handle sexual misconduct proceedings as OCR wanted.  *See How Sexual Assaults Came to Command New Attention*, NPR (Aug. 13, 2014), https://www.npr.org/2014/08/12/339822696/how-campus-sexual-assaults-came-to-command-new-attention

238.    After the 2011 Dear Colleague Letter, the federal government continued to pressure colleges to deal aggressively with reported sexual misconduct, to adopt procedures that do not safeguard the rights of the accused, and to train officials to start with the presumption that an accused student is responsible, all with a focus on protection of women.

239.    In 2014, OCR released additional guidance in which it reiterated many of the directives set forth in the 2011 Dear Colleague Letter, including the directive to "ensure that steps to accord any due process rights do not restrict or unnecessarily delay the protections provided by Title IX to the complainant."   In addition, OCR advised schools to give employees and students "trauma-informed" training and said "hearings should be conducted in a manner that does not inflict additional trauma on the complainant." Questions and Answers on Title IX and Sexual Violence, https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf.

240.    The same year, a White House Task Force was created, co-chaired by the Office of the Vice President and the White House Council on Women and Girls. The Task Force continued the government's focus on protection of women, with a mission "to tell sexual assault survivors that they are not alone" and "help schools live up to their obligation to protect students from sexual violence." *Not Alone: The First Report of the White House Task Force to Protect Students From Sexual Assault*, at 2, https://www.justice.gov/ovw/page/file/905942/download.

241.    The Task Force's first report opened with the claim that "[o]ne in five women is sexually assaulted in college," stated that the federal government was ramping up Title IX enforcement efforts, and stressed again that schools found in violation of Title IX risked losing federal funding. *Id*. at 2, 17.

242.    Among other things, the Task Force supported the use of a single investigator model, which generally involves one school official serving as investigator, prosecutor, and

decisionmaker and severely limits the respondent's ability to challenge the complainant's account. *Id*. at 3, 14.

243.    The Task Force also pressed colleges and universities to provide "trauma-informed" training for their officials, stating that "when survivors are treated with care and wisdom, they start trusting the system, and the strength of their accounts can better hold offenders accountable." *Id*. at 3.

244.    The report stated that the Justice Department, through its Center for Campus Public Safety and its Office on Violence Against Women, was developing trauma-informed training programs. *Id*.

245.    Ultimately, the Department of Justice funded a "Start by Believing" campaign under which investigators are trained to investigate cases from an initial presumption of guilt and write reports "that successfully support the prosecution of sexual assault cases." *End Violence Against Women International, Effective Report Writing: Using the Language of Non-Consensual Sex*, at 6, http://evaw.threegate.com/Library/DocumentLibraryHandler.ashx?id=43; *see also Campus Action Kit, Start by Believing*, https://www.startbybelieving.org/wpcontent/uploads/2019/08/Campus-Action-Kit.pdf.

246.    Among other things, "Start by Believing" training directs investigators to:

    a.   "recreate the entire reality of the sexual assault <u>from the perspective of the victim</u>";

    b.   focus on evidence and statements that "corroborate the victim's account";

    c.   include details not just about what happened, but about "what the victim was thinking and feeling," in order to create a "word picture" that "better support[s] prosecution";

d. "replace neutral words such as 'said,' 'told,' or 'asked'" with more "descriptive" words – e.g., say the "victim" "begged" or "pleaded," and the "suspect" was

"ordering," "insisting," or "demanding";

e. "describ[e] all of the elements that contributed to the victim's experience of force, threat, or fear";

f. "<u>always use the language of non-consensual sex</u>"; i.e., instead of "terms that convey positive, mutual interactions such as 'sexual intercourse' [or] 'oral sex,'" "it is sometimes appropriate to use terminology from the penal code, such as 'rape' or 'sexual assault,'" or, alternatively "simply describe the parts of the body and the things the victim was forced to do with those parts of the body";

g. "highlight implausible, absurd, and/or changing explanations provided by the suspect regarding what happened";

h. "try to anticipate potential defense strategies and include the evidence and information necessary to counter these strategies"; and

i. "ensure that . . . reports include all of the evidence required to prove the elements of the offense and refute the likely defense, which in most sexual assault cases is going to be consent."

*Effective Report Writing: Using the Language of Non-Consensual Sex*, at 5, 7, 8, 10, 11, 12, 14, 23, 30 (emphasis original).

247.    In sum, "Start by Believing" training tells investigators: "By writing the report to recreate the reality of the sexual assault and refute potential defense strategies, investigators can

66

greatly increase the likelihood that charges will be filed in the case and it will result in a conviction. They may even help to make this process faster, smoother, and easier for the victim than it would otherwise be. As one experienced prosecutor summarized, 'a well-written report can make a jury trial into a bench trial and a bench trial into a guilty plea.'" *Effective Report Writing: Using the Language of Non-Consensual Sex*, at 37.

248.    "Start by Believing" is central to the campus climate WRC has created at the University of Illinois. Defendants, through WRC urge everyone to start by believing.

249.    In February 2014, Catherine E. Lhamon, then the Assistant Secretary of Education and head of OCR, told college officials attending a conference that existing practices for handling sexual misconduct complaints send a message "that victimized students are worth less than the people who assault them"; that school officials and she as "chief enforcer" needed to "radically change that message"; and that "if you don't want to do it together, I will do it to you." *Colleges Are Reminded of Federal Eye on Handling of Sexual-Assault Cases*, Chronicle of Higher Education (Feb. 11, 2014), https://www.chronicle.com/article/Colleges-Are-Remindedof/144703.

250.    According to the Chronicle of Higher Education, college officials understood they had been given "crisp marching orders from Washington" to follow OCR's directives. *Id.*

251.    On May 1, 2014, as part of its aggressive enforcement policies following the 2011 Dear Colleague Letter, OCR published a list of 55 higher education institutions nationwide that were then under investigation for possible Title IX violations. *U.S. Department of Education Releases List of Higher Education Institutions with Open Title IX Sexual Violence Investigations* (May 1, 2014), https://www.ed.gov/news/press-releases/us-department-education-releases-listhigher-education-institutions-open-title-ix-sexual-violence-investigations.

252.    According to the Chronicle of Higher Education, that number eventually grew to over 500. *Title IX, Tracking Sexual Assault Allegations,* Chronicle of Higher Education, https://projects.chronicle.com/titleix/.

253.    The sharp increase in the number of investigations – the overwhelming majority of which have involved alleged violations of the rights of complaining students, almost always female – was accompanied by increases in the scope of OCR's investigations, in findings that schools had violated Title IX, and in the imposition of punitive measures as a result.

**B.  In response to government and public pressure, colleges and universities across the nation have adopted Title IX policies and procedures that are "victim"-centered and fundamentally unfair to accused students.**

254.    The threats and pressure from OCR have forced colleges and universities to change their policies, since virtually all colleges and universities in the country receive federal funding.

255.    In response to the federal government's directives and enforcement activities, schools across the nation have adopted special policies for disciplinary proceedings involving alleged sexual misconduct. The policies are administered by designated officials and include investigatory and decision-making processes, evidentiary standards, and appeal processes based on OCR's actual and perceived requirements. In many instances, the policies and processes offer accused students significantly less protections than students receive in other campus disciplinary matters, including matters involving allegations of serious non-sexual misconduct.

256.    In their policies for adjudicating Title IX complaints, many schools have gone even further than OCR's specific directives in adopting procedures favoring alleged victims (the great majority of whom are female) and essentially eliminating fair process protections for respondents (the great majority of whom are male).

257.    Following the model of the federally-funded "Start by Believing" campaign, schools routinely train their officials to apply trauma-informed and "#BelieveWomen" approaches in ways that lead them to presume that an alleged assault occurred, that a complainant's account of an incident must be true, and that a complainant's subjective impressions determine whether conduct is sexual harassment or assault. Students are suspended or expelled without meaningful notice or opportunity to be heard and are left with records that permanently brand them as sexual offenders, devastate them personally, and severely impact their educational and career opportunities.

258.    The same kinds of training and guidance go to other members of the college community, and in this age of social media and the internet, the mere mention of a sexual misconduct accusation can have the same negative and ongoing effects as a finding of responsibility, even if the accused is exonerated.

259.    "Because the changes to the process were impelled in large part by the federal government, the issues presented [in any particular case] are not entirely unique, and not confined to a single campus." *Brandeis*, 177 F. Supp. 3d at 572.

260.    Numerous groups and organizations have spoken out against the legal and financial pressure exerted by OCR to force colleges and universities to find students accused of sexual misconduct (who are overwhelmingly male) responsible, in spite of the evidence or the lack of evidence.  (*See, e.g.*, Foundation for Individual Freedom in Higher Education (FIRE), Stop Abusive and Violent Environments (SAVE), Families Advocating for Campus Equality (FACE), and prominent Harvard and University of Pennsylvania Law School faculty members asserting that OCR's new rules violate the due process rights of the accused.)

261.    In the words of a judge considering college disciplinary procedures that "appear[]
to have substantially impaired, if not eliminated, an accused student's right to a fair and impartial
process:" "it is not enough simply to say that such changes are appropriate because victims of
sexual assault have not always achieved justice in the past. Whether someone is a 'victim' is a
conclusion to be reached at the end of a fair process, not an assumption to be made at the
beginning. Each case must be decided on its own merits, according to its own facts. If a college
student is to be marked for life as a sexual predator, it is reasonable to require that he be provided
a fair opportunity to defend himself and an impartial arbiter to make that decision. Put simply, a
fair determination of the facts requires a fair process, not tilted to favor a particular outcome, and
a fair and neutral fact-finder, not predisposed to reach a particular conclusion." *Brandeis*, 177 F.
Supp. 3d at 573.

262.    Other federal and state courts, as well as some state legislators and university
officials, have similarly expressed concerns that efforts to redress longstanding social problems
are resulting in unfair processes and results in individual Title IX proceedings.

263.    On September 3, 2014, NPR published an article titled, "Some Accused Of Sexual
Assault On Campus Say System Works Against Them." Here, the University of Maine's Dean
Robert Dana recognized that federal pressure made universities rush to judgment on individual
allegations, stating, "I expect that that can't help but be true. Colleges and universities are getting
very jittery about it."  https://www.npr.org/2014/09/03/345312997/some-accused-of-campus-
assault-say-the-system-works-against-them#:~:text=this%20one!'-
,%22,getting%20very%20jittery%20about%20it.%22

264.    In reminiscing about the pressure applied to colleges and universities under the
Obama administration, former Office of Civil Rights lawyer Jackie Gharapour admitted, "We

did see some bad cases in the Obama era, cases where it basically didn't matter what evidence there was. The college was going to find against the defendant, the male defendant, no matter what. I think the schools felt pressure under the Obama guidance." https://www.realclearinvestigations.com/articles/2020/12/15/bidens_pushing_ahead_to_the_ob ama_past_on_campus_rape_hell_need_good_luck_with_that_126353.html?fbclid=IwAR229kx edzNe_pkf7AiQOAmv1XX8O3SMPPs93RFq1wDodqLnudEIqRUc2ow

265.    Similarly, Association of Title IX Administrators ("ATIXA") president, Brett Sokolow recalled that, "the problem of biased outcomes was real. Educational institutions railroaded those accused of sexual violence and harassment (mostly cisgender men) in numbers that should terrify any reasonable person." https://www.insidehighered.com/views/2022/07/12/flexibility-title-ix-regs-blessing-and-curse-opinion

### C.    Starting in 2017, the Department of Education has modified its approach to Title IX enforcement, focusing on fairness to all parties.

266.    In guidance documents issued on September 22, 2017, the Department of Education expressed concern that many schools have established procedures for resolving allegations that "'lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation.'" Dear Colleague Letter (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf. A Q&A on Campus Sexual Misconduct, which the Department adopted the same day, provided guidance on procedural protections necessary for a fair, reliable process. 2017 Q&A, https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

267.    On November 29, 2018, the Department published new proposed regulations for public review and comment. *Nondiscrimination on the Basis of Sex in Education Programs or*

*Activities        Receiving        Federal        Financial        Assistance*,
https://www.federalregister.gov/documents/2018/11/29/2018-25314/nondiscrimination-on-the-basis-of-sex-in-education-programs-or-activities-receiving-federal.

268.    The proposed regulations represented the Department's effort to align Title IX regulatory requirements with basic principles of justice and court rulings requiring that people accused of serious misconduct receive notice, a fair hearing before unbiased decision makers, and a presumption of innocence. *Id*.

269.    The proposed regulations set forth specific procedural protections including:

a.  Provisions requiring schools to provide adequate notice of allegations and their applicable procedures, conduct full and fair investigations, collect, and objectively evaluate both exculpatory and inculpatory evidence, create investigative reports that fairly summarize relevant evidence, provide fair hearings in front of unbiased decisionmakers (who cannot be the same people as the investigator(s)), and give respondents a presumption of non-responsibility.

b.  Provisions requiring schools to allow both parties to review all the evidence related to the allegations (not just evidence the school considers relevant or intends to rely on), so that the parties can meaningfully respond to the evidence before the investigation concludes.

c.  Provisions requiring schools to train officials to conduct impartial proceedings, not to rely on sex stereotypes, and not to base credibility decisions on a party's status as complainant or respondent.

d.  Provisions requiring colleges and universities to provide a live hearing and allow advisors to the parties to cross-examine the other party and witnesses.

270.    The proposed regulations confirmed that "[a school's] treatment of a complainant in response to a formal complaint of sexual harassment may constitute discrimination on the basis of sex under title IX" and that "[a school's] treatment of the respondent may also constitute discrimination on the basis of sex under title IX." Proposed 34 C.F.R. § 106.45.

271.    On May 7, 2020, the Department of Education announced the final Title IX regulations. *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance* (to be published in the Federal Register; unofficial text available at https://www2.ed.gov/about/offices/list/ocr/docs/titleix-regs-unofficial.pdf).

272.    Under the final regulations: "A recipient's response must treat complainants and respondents equitably by offering supportive measures as defined in § 106.30 to a complainant, and by following a grievance process that complies with § 106.45 before the imposition of any disciplinary sanctions or other actions that are not supportive measures as defined in § 106.30, against a respondent." 34 C.F.R. § 106.44(a), as amended.

273.    Section 106.45(b) sets forth the specific requirements for a formal grievance process.

274.    The Department repeatedly emphasized that the protections it mandated are rooted in longstanding principles of due process and fundamental fairness and apply to both private and public institutions. "[A]s the Department has recognized in guidance for nearly 20 years, Title IX rights must be interpreted consistent with due process guarantees." *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, Supplementary Information, at 276.

275.     Section 106.45(a) confirms that a school's "treatment of a complainant or a respondent in response to a formal complaint of sexual harassment may constitute discrimination on the basis of sex under title IX."

276.     As the Department explained: "In every case in which Title IX sexual harassment is alleged, the facts must be resolved accurately to further the non-discrimination mandate of Title IX, including providing remedies to victims and ensuring that no party is treated differently based on sex. . . . The [regulatory] grievance process aims to provide both parties with equal rights and opportunities to participate in the process, and to promote impartiality without favor to complainants or respondents, both because treating a complainant or respondent differently based on sex would violate Title IX, and because a process lacking principles of due process risks bias that in the context of sexual harassment allegations is likely to involve bias based on stereotypes and generalizations on the basis of sex." Supplementary Information, at 220, 277.

**D. University of Illinois' Response to the Proposed 2020 Regulations.**

277.     On January 28, 2019, the University submitted comments on the Notice of Proposed Rulemaking outlining changes to the regulations under Title IX.

278.     Through these comments, the University made its goal of protecting survivors, discriminating against males, and stripping accused students of due process rights well known.

279.     Regarding the proposal to allow advisors to conduct cross-examination, the University stated, "Our most significant concern pertains to the requirement that complainants and respondents must submit to cross-examination by the other party's advisor. Not only do we believe this approach will deter survivors from reporting sexual harassment, but it unnecessarily converts an educational disciplinary process into a quasi-courtroom where those who can afford the best advisor will have the advantage. And as research has shown, in the context of sexual

74

harassment proceedings, the re-traumatization that many survivors experience under adversarial cross-examination can actually stymie the search for truth.[6] … For these and a host of policy and legal reasons explained in detail in the attached comments, we recommend allowing institutions the flexibility to implement procedures that facilitate fact-finding without deterring reporting, re-traumatizing survivors, or compromising due process."

280.    While commenting on its opposition to cross-examination, the University illogically claimed that "adversarial cross-examination in sexual harassment cases can result in inaccurate disciplinary hearing findings." Additionally, the University commented, "Students regularly decide not to pursue criminal complaints and instead limit themselves to internal grievance processes out of fear that they will have to go through embarrassing or re-traumatizing cross-examination in court."

281.    The University took issue with the proposed change in the scope of Title IX, commenting that "we recommend that the Department clarify that recipients have discretion to utilize a unified system for handling allegations of sexual harassment no matter where in the world such conduct occurred." Bizarrely, the University did not implement a unified system in handling accusations of sexual misconduct despite its ability to do so at all relevant times.

282.    Defendants took issue with the proposed rule stating that, "a recipient's treatment of the respondent may also constitute discrimination on the basis of sex" To this, the University responded that procedural defects are not forms of sex discrimination and should not threaten federal funding.

283.    The University also proposed that the presumption of non-responsibility be changed to no presumption at all. Specifically, the University remarked that the presumption of

---

[6] The University did not provide any citation or evidence to support this remark.

not responsible "creates a built-in bias against complainants. Such biases may be warranted in criminal proceedings but are inconsistent with the equitable treatment of complainants and respondents in a context in which the recipient has an ongoing legal duty to ensure equal access to education for all students," and "compelling an adversarial process that is initiated by a complainant alleging a violation occurred, coupled with a statement that the respondent is presumed to not have engaged in the conduct—or that the conduct does not violate the policy—necessarily creates a bias in favor of the respondent and against the complainant." In other words, the University took issue with the fact that, under the new regulations, it would be barred from "Starting by believing."

284.    The University proposed that it should have no burden of gathering evidence, stating "Placing the burden of gathering evidence on the recipient suggests an adversarial rather than educational process." The University also requested that it only be required to "make a copy of the draft investigative report section that fairly summarizes the relevant evidence available for inspection and review by the parties," thereby allowing the University to control the narrative and evidence and find students responsible more easily.

285.    Most importantly, the University, through its comments, made clear that the University does not believe the purpose of a hearing is to determine whether alleged conduct actually occurred, but rather, to explore the impact the conduct had on the students. Specifically, the comments state, "usually, the hearings are a dialogue between the students and the decision-maker(s) to evaluate the impact of the conduct on the academic community." Here, the University stated that the purpose of its hearing is not to determine whether alleged conduct occurred. Instead, the University presumes the alleged conduct occurred and utilizes a hearing to discuss the conduct's "impact." Plaintiff's disciplinary matter was no different. The University presumed

76

that Plaintiff engaged in misconduct, and used the hearing to discuss the impact Plaintiff's alleged conduct had on Ms. Roe.

**E. Pressure Applied to University of Illinois Directly.**

286.    In addition to the pressure that has been applied to colleges and universities generally since the 2011 Dear Colleague Letter, University of Illinois has been subjected to specific pressure and criticism regarding its handling of sexual assault, and in particular, pressed to do more to protect female "survivors" and punish male "perpetrators."

287.    On August 27, 2019, NPR published an article titled, "At the University of Illinois at Urbana-Champaign, Preserving the Reputations of Sexual Harassers." The article criticized the University of Illinois for not taking complaints of sexual harassment against a male professor seriously, stating, "by the time officials at the University of Illinois' flagship campus in Urbana-Champaign found that an assistant professor in the College of Veterinary Medicine had engaged in sexual harassment, three women had come forward to raise concerns about his behavior." The article continued to highlight the steps that University of Illinois had taken to help numerous professors maintain clean records despite being found responsible for policy violations. The article alleged that, rather than mark the respondents' records, the University of Illinois would: "let[] them resign, pay[] them for periods they weren't working, promis[e] not to discuss the reasons for their departures and, in some cases, keep[] them on the faculty." https://will.illinois.edu/news/story/at-the-university-of-illinois-at-urbana-champaign-preserving-the-reputations-of-sexual-harassers.

288.    The investigation NPR conducted found that it had been common practice for University of Illinois to attempt to hide allegations and findings of sexual misconduct on its campus.

289.    During the investigation, Kathryn Clancy, a University of Illinois professor, who is an purported expert on sexual harassment in academia stated in an interview, "The entire way we engaged with questions of perpetration on campuses is wrong and broken… we are just doing what everyone else is doing. And it's the wrong way to be doing things."

290.    In response to the investigation, University leaders stated that they are committed to change. For example, the chancellor of the University Robert Jones remarked that the University would begin disclosing the reasons for a professor's departure to other universities. Jones noted that this is "critically important in this particular point in our history," referring to the #MeToo movement.

291.    Both in the article and in the outside world, the allegations against University of Illinois were met with animosity from current staff, former staff, and the public.

292.    The article also criticized University of Illinois for allegedly retaliating against female students who filed complaints for sexual misconduct by taking the accusers out of their programs under the guise of "informal resolution."

293.    In a retaliatory response to the article, the University demanded that NPR Illinois release information of other students who reported to NPR in confidence that they were victims of sexual misconduct. While University of Illinois stated that they requested the information to protect students and comply with Title IX, the true intent of the University was to chill reporting that was critical of the University.

294.    In response to the University's actions against NPR, the Chicago Tribune published an article on October 17, 2019 titled "Commentary: The U. of I., stung by #MeToo investigation, is now leaning on Title IX to muzzle reporters." In the article, the University is accused of retaliating against Rachel Otwell, a reporter for NPR Illinois, for "expos[ing] the

University of Illinois' deplorable handling of sexual misconduct complaints on campus," and "reveal[ing] the University of Illinois' pattern of callous response to complaints." The article continues to accuse the University of Illinois of essentially placing a stop work order on Otwell, so that she did not uncover more instances of the University failing to properly handle allegations of sexual misconduct. "Predatory professors and indifferent university administrators could sleep easier, their secrets safer," the article wrote. https://www.chicagotribune.com/opinion/commentary/ct-opinion-rachel-otwell-university-illinois-greising-20191017-2d2uin3z2vea5ilj2jv5e5qrba-story.html.

295.    The NPR Illinois investigation and University of Illinois' response garnered national attention, including attention from the New York Times. https://www.nytimes.com/2019/11/12/business/media/npr-university-of-illinois-aclu-sexual-misconduct.html.

296.    On August 27, 2019, ProPublica published an article titled "One Campus. Seven Professors Facing Harassment Accusations. Few Consequences." The article further highlighted the lack of response from University of Illinois raised by NPR, and went in depth into the allegations against the various professors, as well as the University's abhorrent response and attempts to minimize allegations and/or protect the accused. https://www.propublica.org/article/university-of-illinois-urbana-champaign-professors-sexual-harassment-accusations

297.    On September 10, 2019, ProPublica published another article titled, "Assaults, Bullying, Rape: A Lawsuit Against One Professor Claims a University Didn't Stop Him." The article discussed a lawsuit filed by two former University of Illinois students, who sued Professor Gary Xu for sexual abuse, amongst other things. The article stated that, "the lawsuit claims the

university did not adequately respond to what it knew about Xu's conduct. It asserts that UIUC

was well aware of allegations against Xu years before it took action. Ann Olivarius, an attorney

for the plaintiffs, said the university 'cast a blind eye' on Xu's conduct. 'I've spoken to a number

of faculty, and they certainly were well aware of the misconduct of Gary Xu over a long period.'"

https://www.propublica.org/article/assaults-bullying-rape-a-lawsuit-against-one-professor-

claims-a-university-didnt-stop-him

  298. On January 21, 2020, the DailyIllini published an article titled, "Hana Inman-

Grabow fights for personal justice with Title IX." In the article, the University was accused of

and criticized for the injustice consciously made by the University. The article claimed that the

University was bias against her, stating, "students need to feel comfortable, like they're not going

to go in there and be scared of being accused of lying. It's bad enough you went through the

experience, but when authorities are literally telling you that you're a liar, these authorities told

me that I'm not credible and they completely ignored all the things I went through. That makes

it ten times worse because I went through those things." https://dailyillini.com/news-

stories/2020/01/21/inman-grabow-justice/

  299. In general, the student body, which the University of Illinois utilizes as members

of hearing panels, carries a culture of "Start by Believing." On April 15, 2020, the Daily Ilini, a

student newspaper at the University of Illinois, published an article titled, "Campus advocate

shares experiences during Sexual Assault Awareness Month." In the article, it states, "If you are

trying to support a survivor, it's very important to believe them and it's very important to validate

their story. Right now, I'm seeing so much in the media… saying 'that person was lying,' 'that

story is fake,' and I would encourage people to look deeper within themselves when they engage

in that radical rhetoric." https://dailyillini.com/life_and_culture-stories/2020/04/15/sexual-assault-awareness-month-2/.

300.    Defendants have responded to the aforementioned criticism by subscribing to the theory of "start by believing" women.

**F. Pro-"victim" bias violates Title IX.**

301.    Since cases involving alleged sexual misconduct on college campuses overwhelmingly arise from a woman accusing a man, measures that are put in place to protect alleged victims and punish alleged perpetrators necessarily result in harsher treatment of men.

302.    As WRC claims on their web page, men commit sexual assault far more often than women.

303.    Indeed, as noted above, efforts to provide more protections to reported victims of sexual misconduct have consistently focused on protection of women.

304.    As the new Title IX regulations confirm, any approach under which accused people are presumed guilty or deprived of the ability to defend themselves, or individual cases are resolved without full and fair consideration of the facts of each case, is contrary to this nation's fundamental principles and contrary to Title IX and the Clery Act's requirements of a "prompt, fair, and impartial investigation and resolution." 20 U.S.C. § 1092(f)(8)(B)(iv)(I)(aa); *see also* 34 C.F.R. 106.8(b) and 45 C.F.R. § 86.8(b) (quoted above).

305.    In the words of Justice Ruth Bader Ginsburg, fair process for the accused "must not be ignored and it goes beyond sexual harassment. The person who is accused has a right to defend herself or himself, and we certainly should not lose sight of that. Recognizing that these are complaints that should be heard. There's been criticism of some college codes of conduct for not giving the accused person a fair opportunity to be heard, and that's one of the basic tenets of

our system, as you know, everyone deserves a fair hearing." Asked how to "balance the values of due process against the need for increased gender equality," Justice Ginsburg replied: "It's not one or the other. It's both. We have a system of justice where people who are accused get due process, so it's just applying to this field what we have applied generally." Jeffrey Rosen, *Ruth Bader Ginsburg Opens Up About #MeToo, Voting Rights, and Millennials*, The Atlantic (Feb. 15, 2018), https://www.theatlantic.com/politics/archive/2018/02/ruth-bader-ginsburg-opens-upabout-metoo-voting-rights-and-millenials/553409/.

306.    That measures to protect reported victims are generally equated with protection of women, and measures to ensure a fair process for respondents are generally equated with protection of men, has been starkly confirmed by responses to the Department of Education's 2017 guidance and its proposal in 2018 to amend Title IX regulations to ensure a fair process for both complainants and respondents.

307.    Over 100,000 comments were filed to the proposed regulations, with a common theme being allegations that the Department's efforts to restore fair processes in campus disciplinary proceedings were motivated by bias against women and disproportionately burden women.

308.    To avoid gender discrimination, campus disciplinary proceedings should be fundamentally fair to all participants: complainants and respondents, regardless of sex.

**G. Both on their face and as applied, University of Illinois' policies and procedures violate Title IX.**

309.    Both on their face and as applied in this case, University of Illinois' policies and procedures for handling allegations of sexual misconduct violated Title IX. University of Illinois reached an erroneous outcome, selectively enforced its disciplinary procedures, applied archaic

assumptions, and acted with deliberate indifference to Ms. Roe's misconduct against Plaintiff, all based on Plaintiff's gender. Among other things, as set forth above, University of Illinois:

    a. Ignored and misapplied its own Policy and procedures based on Plaintiff's gender.

    b. Reached a result-driven determination rather than reaching a decision based on a preponderance of all relevant evidence.

    c. Made credibility determinations against Plaintiff and in favor of Ms. Roe that were not rationally based on the evidence.

    d. Failed to question Ms. Roe's credibility in light of documented evidence produced by Plaintiff which demonstrated that Ms. Roe was not being truthful and/or accurate.

    e. Selected evidence to support Ms. Roe's narrative while ignoring evidence of her inconsistencies and false statements.

    f. Failed to follow the policies and procedures set forth by Title IX.

    g. Willfully ignored Ms. Roe's behavior after the alleged rape, including spending the rest of the night with Plaintiff and coercing Plaintiff to engage in sexual conduct with her the next day.

    h. Made improper and speculative inferences from Plaintiff's "delayed participation" and used manufactured inconsistencies to find him not credible across the board.

    i. Treated the parties significantly differently throughout Plaintiff's claims against Ms. Roe, as well as Ms. Roe's claims against Plaintiff, based on the gender of the parties.

j.  Selectively enforced its Policy by treating the parties differently when they reported Policy violations, taking Ms. Roe's reports seriously, allowing her a hearing to question Plaintiff, allowing her to give a victim impact statement, and being asked what sanction she would like to have issued to Plaintiff. Conversely, Defendants did not take Plaintiff's claims against Ms. Roe seriously, but instead, blamed Plaintiff for being assaulted, did not allow the matter to go to a hearing so Plaintiff could be heard, did not allow Plaintiff to submit a victim impact statement, and did not ask Plaintiff his position on sanctions.

k.  Failing to train its officials to handle sexual assault allegations fairly and impartially.

310.  University of Illinois fosters a campus community that encourages students, staff, and officials to "Start by Believing" and promotes the belief that only females are victims of sexual misconduct and only males are perpetrators of sexual misconduct.

311.  The University's process is not intended to treat complainants and respondents equally, or to fairly investigate and adjudicate complaints. The University's process is intended to "protect the safety of complainants and promote accountability." The University reaches the goal of responding in a manner designed to eliminate the misconduct by arbitrarily finding male respondents, like Plaintiff, responsible for violations and removing them from campus.

312.  University of Illinois' discriminatory and one-sided process deprived Plaintiff, as a male student, of educational opportunities on the basis of sex.

313.  Plaintiff's case is part of a pattern and practice of Title IX violations and discrimination against male students accused of sexual misconduct.

314.    In March, 2019, for example, a male student sued University of Illinois based on its investigation and adjudication of a female student's reports of sexual misconduct by him, even though the allegations were demonstrably false. *Doe v. Board of Trustees of the University of Illinois*, 2:19-cv-02054-CSB-EIL (C.D. Ill.).

315.    Information concerning sexual misconduct complaints at University of Illinois and the outcome of disciplinary proceedings involving male students compared to female students is in University of Illinois' exclusive possession and control. Upon information and belief, statistics within University of Illinois' exclusive possession and control will show a pattern of intentional discriminatory conduct, erroneous outcomes, archaic assumptions, and selective enforcement based on gender.

316.    Upon information and belief, statistics within University's exclusive possession and control will show that students accused of sexual misconduct are overwhelmingly male, and that male students accused of sexual misconduct are overwhelmingly found responsible.

317.    Upon information and belief, statistics within University's exclusive possession and control will show that female students accused of serious sexual or non-sexual misconduct are treated more favorably than male students in general, and Plaintiff in particular.

318.    As a direct, proximate, and foreseeable consequence of Defendants' violations of Title IX, Plaintiff sustained significant damages, including, but not limited to, damages to reputation, loss of educational opportunities, loss of career opportunities, loss of future career prospects, economic injuries, and other direct and consequential damages.

319.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT II

**Breach of Contract**
**(Against the Board of Trustees)**

320.     Plaintiff repeats and realleges each and every allegation set forth above as if fully rewritten herein.

321.     At all relevant times, a contractual relationship existed between Plaintiff and University of Illinois.

322.     The promises contained in University of Illinois' Student Code and Policies are legally binding obligations.

323.     Defendant was required to act in accordance with the University's written policies and procedures in investigating and adjudicating reports of alleged violations of student conduct standards.

324.     Based on the facts and circumstances set forth in this Complaint, Defendant materially breached its express and/or implied agreements with Plaintiff by failing to comply with its obligations, standards, policies, and procedures in the course of the disciplinary proceedings against Plaintiff and against Jane Roe, and by subjecting him to fundamentally unfair processes.

325.     In its Policy and Handbook, University of Illinois promises, among other things, that it will:

    a.   Prohibit advisors from speaking for their advisees or otherwise directly participate in the process;

    b.   Objectively evaluate evidence;

    c.   Avoid making disciplinary decisions, including credibility determinations, based on a person's status as a complainant, respondent, or membership in a protected class, such as gender;

    d.   Attempt to interview all relevant witnesses;

    e.   Timely adjudicate disciplinary matters, or, at the very least, notify the parties of the delay and reason for delay;

    f.   Appoint panel members who are free of conflicts of interest or bias;

    g.   Prohibit irrelevant evidence from being presented at the hearing, including character evidence;

    h.   Prohibit victim-impact statements during phase one of the hearing;

    i.   Correct any errors in the investigation and/or adjudication process through an appeal; and

    j.   Hold sanctions in abeyance pending an appeal.

326.   Defendant materially breached its obligations when, among other things, it:

    a.   Allowed Ms. Roe to have an advisor serve as a witness and directly participate in the hearing;

    b.   Allowed character evidence to be admitted against Plaintiff;

    c.   Allowed multiple "victim-impact" statements to be admitted during Phase One of the hearing;

    d.   Questioned Plaintiff about his appeared lack of participation in the investigation and used his level of participation against him;

    e.   Failed to explore any of Ms. Roe's strange behavior, the inconsistencies in her narrative, and her decisions to willfully omit relevant evidence.

    f.   Allowed bias individuals to serve on the panel;

    g.   Allowed these bias panel members to criticize Plaintiff for following medical advice and mixing prescriptions;

    h.   Allowing non-experts give expert testimony on trauma responses;

    i.   Allowing witnesses to provide irrelevant information, such as Plaintiff allegedly punching a wall on a prior instance.

    j.   Allowing witnesses to opine that Plaintiff is a rapist, that he is "clearly lying" and "clearly making statements that shows he is guilty."

    k.   Shifting the burden of proof onto Plaintiff.

327.   Defendant materially breached its Policy when it treated Plaintiff drastically different than Jane Roe during the disciplinary matter against Plaintiff, as well as the disciplinary matter against Jane Roe.

328.   Defendant materially breached its Policy when it failed to correct the material procedural errors and clearly erroneous outcome on appeal.

329.   Plaintiff fully complied with his contractual obligations to the University of Illinois.

330.   As a direct, proximate, and foreseeable consequence of Defendant's breach of its express and/or implied contractual obligations, Plaintiff sustained significant damages, including, without limitation, damage to reputation, loss of educational opportunities, loss of career opportunities, loss of future career prospects, economic injuries, and other direct and consequential damages.

331.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT III

### Declaratory Judgment
### (Against All Defendants)

332.    Plaintiff repeats and realleges each and every allegation set forth above as if fully rewritten herein.

333.    Defendants committed numerous violations of Plaintiff's rights as set forth herein.

334.    Plaintiff's future educational and career prospects have been severely damaged. Without appropriate redress, the erroneous outcome will continue to cause irreversible and irreparable damages to Plaintiff and his educational and employment prospects, in perpetuity.

335.    As a result of the foregoing, there exists a justiciable controversy between the Plaintiff and Defendant with respect to the outcome, permanency, and future handling of Plaintiff's formal student record at the University.

336.    Therefore, Plaintiff respectfully requests that this Honorable Court, pursuant to 28 U.S.C. §2201, declare that: (i) the outcome and findings made by Defendant relating to the allegations set forth by Jane Roe should be reversed; (ii) Plaintiff's reputation be restored; (iii) Plaintiff's disciplinary record be expunged and sealed; (iv) any record of Plaintiff's dismissal from the University be removed from his educational file; (v) any record of Jane Roe's complaint against Plaintiff be permanently destroyed; (vi) Plaintiff be reinstated to the University as a student in good academic standing; (vii) University's rules, regulations and guidelines relating to the adjudication of allegations of sexual misconduct are unconstitutional as applied.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues triable by jury.

## PRAYER FOR RELIEF

WHEREFORE, for the foregoing reasons, Plaintiff respectfully requests that this

Honorable Court:

(a)     Order University of Illinois to reverse and expunge its findings of responsibility and sanction of expulsion from Plaintiff's education record;

(b)     Order University of Illinois to provide a Dean's Certification that shall be made available to third parties (such as educational institutions and prospective employers) certifying that it has reversed and expunged the findings and sanction;

(c)     Award Plaintiff compensatory and punitive damages in an amount to be determined at trial, including, without limitation, damage to reputation, loss of educational opportunities, loss of career opportunities, loss of future career prospects, economic injuries, and other direct and consequential damages;

(d)     Award prejudgment interest;

(e)     Award attorneys' fees and costs pursuant to statutory or common law doctrines providing for such award; and

(f)     Grant such other and further relief that the Court deems just and proper.


Respectfully submitted,

*/s/ Eric F. Long*
ERIC F. LONG (ARDC #6299362)
TYLER J. WALCHANOWICZ (OH # 0100115)
Friedman Nemecek & Long, L.L.C.
1360 East 9th Street, Suite 650
Cleveland, OH 44114
P: (216) 928-7700
F: (216) 820-4659
E: efl@fanlegal.com
E: tjw@fanlegal.com